(No. 17454.—

THE CHICAGO MOTOR COACH COMPANY *et al.* Appellants,
*vs.* THE CITY OF CHICAGO *et al.* Appellees.

*Opinion filed June 19, 1929—Leave to file petition for rehearing
denied December 17, 1929.*

STONE and HEARD, JJ., dissenting.

RYAN, CONDON & LIVINGSTON, (JAMES G. CONDON, IRVIN I. LIVINGSTON, CHARLES LEROY BROWN, JOHN J. SHARON, LIONEL A. MINCER, FRANK H. SCOTT, LELAND K. NEEVES, and DAVID J. GREENBERG, of counsel,) for appellants.

SAMUEL A. ETTELSON, Corporation Counsel, FRANCIS X. BUSCH, and JAMES J. COUGHLIN, (WILLIAM J. TUOHY, C. MORTON DOTY, C. R. LARRABEE, LEON HORNSTEIN, FREDERICK A. BANGS, and JAMES I. McCARTHY, of counsel,) for appellees.

Mr. JUSTICE DUNN delivered the opinion of the court:

The circuit court of Cook county having sustained a demurrer to a bill for an injunction and dismissed the bill for want of equity, the complainants have appealed.

The Chicago Motor Coach Company and several of its employees, in behalf of themselves and all other persons similarly situated and with like rights, filed a bill in the circuit court of Cook county against the city of Chicago, its mayor and superintendent of police to restrain the enforcement of an ordinance of the city. The bill was twice amended, and a demurrer to the second amended bill having been sustained, the court dismissed it for want of equity. The complainants have appealed directly to this court, the validity of a municipal ordinance being involved and the judge having made the statutory certificate required for such appeal.

It appears from the bill that the Chicago Motor Coach Company is an Illinois corporation organized in 1913 under the name of Chicago Motor Bus Company, which was later changed to Chicago Motor Coach Company, to operate for public use, in the transportation of persons for compensation upon streets in the city of Chicago, omnibuses propelled by gasoline, kerosene or petrol power, or any other type of vehicle running on the ordinary surface of the ground and not on fixed rails which may at any time be lawfully used, and to do a general omnibus business; that since its organization it has operated motor busses upon certain streets in Chicago for the transportation of persons for hire; that before it began to operate motor busses on the streets the State Public Utilities Commission, and afterward its successor, the Illinois Commerce Commission, on the applica-

tion of the company issued to it certificates of public convenience and necessity for the operation of motor busses over certain designated boulevards, including nineteen streets which were named in the bill, and that in pursuance of its charter and such certificates of public necessity and convenience it has developed and established and is now maintaining and operating a comprehensive and extensive system of motor bus transportation of passengers for hire on the boulevards, parkways and streets in the city of Chicago through the residential and business sections, extending from Devon avenue, in the north part of the city, to Ninety-second street, in the south part, a distance of approximately 20 miles, and is daily operating its busses on fixed time schedules, on fixed routes, designated in the certificates of public convenience and necessity, which routes aggregate 47.6 miles in extent, of which approximately 41.6 miles are located in boulevards and parkways which are under the jurisdiction of the Lincoln Park Commissioners and the South. Park Commissioners and only approximately six miles along the nineteen streets of the city of Chicago mentioned in the bill; that the routes connect so as to comprise one system of transportation, and the corporation is now employing 287 motor busses in the operation of such routes and systems, which are carrying on an average from 145,000 to 150,000 passengers daily; that on November 22, 1922, the city council of the city of Chicago enacted an ordinance by which all general ordinances of the city were revised and codified in the form of a comprehensive code known as the "Chicago Municipal Code of 1922," section 2761 of which declares it to be unlawful for any person, firm or corporation to operate motor busses as common carriers on any street in the city of Chicago without first having obtained a specific grant of authority to do so from the city council in the form of an ordinance designating the routes and fixing the terms and conditions under which such busses may be operated, and section 2762 provides a penalty for a viola-

tion of the ordinance; that on February 5, 1924, the city of Chicago notified the company that the use made of the streets mentioned in the bill by motor busses of the company is unlawful in the absence of special franchise, license or permission, and that unless within ten days application was made to the city council for a franchise, license or permission to operate its busses in the streets named, the city would proceed to arrest the drivers of the busses and prevent the unlawful operation of such busses on the streets. The bill averred that the attempt to enforce the sections of the ordinance mentioned would cause irreparable injury to it and damages which could not be adequately compensated, and prayed that the defendants be enjoined from enforcing sections 2761 and 2762 of the Chicago municipal code of 1922 and from interfering with the operation of the motor busses upon the streets mentioned in the bill.

The question for decision is, Has the city the power to prohibit the operation on its streets of motor busses, as common carriers of passengers, by a public utility which has obtained a certificate of public convenience and necessity for such operation from the Illinois Commerce Commission? The appellants deny this power, the appellees affirm it. The city of Chicago is organized under the general Cities and Villages act. It has no inherent powers. It is thoroughly settled and too well known to require the citation of any authority, that in this State cities are creatures of the legislature and derive all their powers only from the statutes which the legislature enacts. To authorize the exercise of any power by a city a statute must be shown expressly granting the power or making a grant in such terms as necessarily imply its existence. The absence of such grant excludes the power. Statutes granting powers to municipal corporations are strictly construed and a reasonable doubt of the existence of the power must be resolved against it. The city, in exercising the power granted to it by the legislature, acts as the agent of the State, and the legislature

may at any time change its agent and by another statute provide that the power previously exercised by the city shall be exercised by some other agency. There is no disagreement about these statements of the law. The appellants deny that the legislature has ever authorized cities to prohibit the operation on their streets of motor busses as common carriers of passengers, and aver that if it ever has done so the power has been withdrawn by the Public Utilities act.

The powers which may be exercised by cities organized under the Cities and Villages act are enumerated in section 1 of article 5 of that act (par. 65 of chap. 24 of the Revised Statutes,) as amended. This section consists of one hundred and one clauses, many of which refer to powers to be exercised in regard to streets, alleys and public grounds. The only two material to be considered here are clauses 7 and 9, which confer power: "Seventh—To lay out, to establish, open, alter, widen, extend, grade, pave or otherwise improve streets, alleys, avenues, sidewalks, wharves, parks and public grounds, and vacate the same, and for such purposes or uses to take real property or portions thereof belonging to said city or village and already devoted to a public use when such taking will not materially impair or interfere with the use already existing and is not detrimental to the public. * * * Ninth—To regulate the use of the same."

Automotive vehicles are lawful means of conveyance and have equal rights upon the streets with horses and carriages. (*Christy* v. *Elliott,* 216 Ill. 31; *Ward* v. *Meredith,* 220 id. 66; *Indiana Springs Co.* v. *Brown,* 165 Ind. 465; *Shinkle* v. *McCullough,* 116 Ky. 960.) Many cases have been decided respecting the validity and construction of statutes and ordinances regulating their use upon public highways, and it has been uniformly held that the State, in the exercise of the police power, may regulate their speed and provide other reasonable rules and restrictions as to their use. (*Commonwealth* v. *Kingsbury,* 199 Mass. 542;

*Christy* v. *Elliott, supra; State* v. *Swagerty,* 203 Mo. 517; *State* v. *Mayo,* 106 Me. 62.) Driven by indifferent, careless or incompetent operators these vehicles may be a menace to the safety of the traveling public, and it has been held that under its authority to regulate the use of the streets a city may enact ordinances which may diminish this danger, and for this purpose may regulate the speed of automobiles and repress their careless management. *City of Chicago* v. *Kluever,* 257 Ill. 317; *People* v. *Schneider,* 139 Mich. 673; *Commonwealth* v. *Kingsbury, supra; Brazier* v. *Philadelphia,* 215 Pa. St. 297.

The legislature may prohibit by general law the operation of automotive vehicles upon the public highways of the State and it may delegate to the cities in the State the power to prohibit such operation within the respective cities. It has not done either in this State. The city has therefore never had the power to prohibit the operation of automotive vehicles on the city streets. It had the power, under clause 9 of section 1 of article 5 of the Cities and Villages act, to regulate the use of the streets by automotive vehicles but not to prohibit the use of the streets by them. Regulation is inconsistent with prohibition or exclusion. While it is within the power of the legislature to prohibit the use of the public highways of the State by motor busses, yet until the enactment of a law prohibiting or regulating their use they are lawful vehicles and means of conveyance, and have an equal right with omnibuses drawn by horses, trucks and other lawful conveyances, to operate upon the public highways upon compliance with the local ordinances prescribing regulations for their use of the highways, lawfully adopted by the several municipalities in which they operate. (*G. R. G. H. & M. Ry. Co.* v. *Stevens,* 219 Mich. 332.) Even the legislature has no power to deny to a citizen the right to travel upon the highway and transport his property in the ordinary course of his business or pleasure, though this right may be regulated in accordance with the public in-

terest and convenience. Where one undertakes, however, to make a greater use of the public highways for his own private gain, as by the operation of a stage coach, an omnibus, a truck or a motor bus, the State may not only regulate the use of the vehicles on the highway but may prohibit it. A municipality can do so only under a power expressly granted by the State. *Ex parte Dickey,* 76 W. Va. 576.

It may be conceded that the city of Chicago had the power, by reason of the grant of the legislature of power to regulate the use of the streets, to designate the routes and fix the terms and conditions upon which motor busses might be permitted to operate on the streets. Under the powers granted to city councils by the various clauses of section 1 of article 5 of the Cities and Villages act, the city of Chicago, and many other cities and villages in the State, prior to the going into effect of the Public Utilities act of 1913, (Laws of 1913, p. 459,) which became effective on January 1, 1914, properly enacted many ordinances providing rules for the regulation of public utilities and from time to time amended and changed such rules. The ordinances were authorized by the legislature and compliance with them by the public utilities was required by the courts. Section 8 of the Public Utilities act gave general supervision of all public utilities to the Public Utilities Commission, and section 9 required every public utility to comply with every order, decision, direction, rule or regulation made by the commission in every matter in any way relating to or affecting its business as a public utility. Section 32 required every public utility to furnish, provide and maintain such service, instrumentalities, equipment and facilities as should promote the safety, health, comfort and convenience of its patrons, employees and the public and as should be in all respects adequate, efficient, just and reasonable. Section 49 provided that whenever the commission, after a hearing, should find that the rules, regulations, practices, equipment, appliances, facilities or service of any public utility or the

methods of manufacture, distribution, transmission, storage or supply employed by it were unjust, unreasonable, unsafe, improper, inadequate or insufficient, it should determine the just, reasonable, safe, proper, adequate or sufficient rules, regulations, practices, equipment, appliances, facilities, service or methods to be observed, furnished, constructed, enforced or employed and should fix the same by its order, decision, rule or regulation. It was further provided that the commission should prescribe rules and regulations for the performance of any service or the furnishing of any commodity of the character furnished or supplied by any public utility. Section 50 provided that whenever the commission, after a hearing, should find that additions, extensions, repairs, improvements or changes in the existing plant, equipment, apparatus, facilities or other physical property of any public utility ought reasonably to be made or that a new structure or structures should be erected to promote the security or convenience of its employees or the public or in any other way to secure adequate service or facilities, the commission should order such additions, extensions, repairs, improvements or changes to be made or such structure or structures to be erected. Section 57 gave the commission power, after a hearing, to require every public utility to maintain and operate its plant, equipment or other property in such manner as to promote and safeguard the health and safety of its employees, passengers, customers and the public, and to this end to prescribe, among other things, the installation, use, maintenance and operation of appropriate safety or other devices or appliances, to establish uniform or other standards of equipment, and to require the performance of any other act which the health or safety of its employees, passengers, customers or the public might demand. Section 64 authorized complaint to be made by any municipal corporation of any act or thing done or omitted to be done in violation, or claimed to be in violation, of any provision of the act or of any order or rule of the

commission. Each city was given the power to appear as complainant or make application before the commission for an inquiry, investigation or hearing relating to the rates or other charges for services of public utilities within such city, and in case of any inquiry, investigation or hearing by the commission, ten days' written notice to the city was required before such inquiry, investigation or hearing, and the city was entitled to appear and present evidence relating to the subject matter. Section 65 provided for hearings, the issue of process to enforce the attendance of witnesses, the taking of evidence, the entry and service of orders, which should of their own force take effect and become operative twenty days after service, except as otherwise provided. Sections 68 and 69 provided for appeals from the orders of the commission, and section 76 prescribed a penalty for a failure to comply with any provision of the act or with any order of the commission.

The language of the act is sufficiently comprehensive to subject every phase of the relations between every public utility and the public to the supervision and regulation of the Public Utilities Commission. The commission was invested with the supervision of all public utilities, authorized to fix the safe, proper or adequate equipment to be employed, to direct additions, improvements or changes to be made, to determine the just, reasonable, safe, proper, adequate or sufficient rules, regulations, practices, equipment, appliances, facilities, service or methods to be observed, furnished, constructed, enforced or employed and to fix them all by its order, decision, rule or regulation, and every public utility was required to comply with every order, decision, rule and regulation of the commission. These provisions certainly covered the whole field of service of every utility. They left no room for the exercise of authority of any other body. The vesting of the power conferred by this act in the Public Utilities Commission necessarily withdrew from cities and villages all such power as they had previ-

ously been authorized to exercise in the premises. This was the decision in *Northern Trust Co.* v. *Chicago Railways Co.* 318 Ill. 402. The question had previously been decided in the same way in *Village of Atwood* v. *Cincinnati, Indianapolis and Western Railroad Co.* 316 Ill. 425. These decisions were followed in *City of Witt* v. *Cleveland, Cincinnati, Chicago and St. Louis Railway Co.* 324 Ill. 494, and *Chicago North Shore and Milwaukee Railroad Co.* v. *City of Chicago,* 331 id. 360. In the case last cited, as in this case, it was argued that there was no inconsistency between the grant to the city of exclusive power to consent to the occupation of its streets and the Public Utilities act but that they should be construed together, because clause 24 of section 1 of article 5 of the Cities and Villages act and clause 5 of section 19 of the general Railroad act both provide that the consent of the city must be obtained before a commercial railroad can cross or occupy the streets of the city, and there is no provision in the Public Utilities act which purports to give the commission authority to grant such railroad the right to cross or occupy city streets without the consent of the city; that clause 24 of section 1 of article 5 of the Cities and Villages act was amended and re-enacted in 1919 after the passage of the Public Utilities act, and that section 81 of the Public Utilities act of 1921 expressly denied any intent to limit or restrict the power of municipalities to grant and control the use and occupation of the streets. This provision of section 81 of the Public Utilities act of 1921, effective when adopted, is as follows: "Nothing in this act shall be construed to limit or restrict powers now or hereafter granted to cities to pass ordinances for the protection of the public health, safety, comfort, and general welfare, or governing the regulation, control or occupation of streets, highways and public property within the city. Nothing in this act shall be construed to limit or restrict the powers granted to cities by this article, nor to extend the jurisdiction of the Illinois Commerce

Commission over the matters covered by this article except as herein provided. Nothing in this article shall be construed to conflict with powers conferred by this act upon the Illinois Commerce Commission, so far as the exercise of such powers by the commission is necessary or appropriate to its authority with respect to public utilities under the jurisdiction of the commission."

Clause 24 of section 1 of article 5 of the Cities and Villages act provides that the city council in cities and president and board of trustees in villages shall have the following powers: "To permit, regulate or prohibit the locating, constructing or laying a track of any horse or electric railroad in any street, alley or public place; but such permission shall not be for a longer time than for twenty years." Clause 90 of this section provides that "the city council or board of trustees shall have no power to grant the use of or the right to lay any railroad tracks in any street of the city to any steam, dummy, electric, cable, horse or other railroad company, * * * except upon the petition of the owners of the land representing more than one-half of the frontage of the street, or so much thereof as is sought to be used for railroad purposes." In regard to the claim of the city that there is no inconsistency or repugnancy between these provisions of the Cities and Villages act just quoted and the provisions of section 81 of the Commerce Commission act, the court in the case last above cited said: "It seems clear that the provisions of section 81 of the Public Utilities act above quoted and the provisions of the Cities and Villages act just quoted relate to the location of the tracks over and along streets and consent or license to construct tracks across or upon the streets, rather than the supervision, regulation and control of the operation of such railroads when constructed. Section 8 of article 1 of the Public Utilities act, as revised in 1921, (Smith's Stat. 1927, p. 2130,) confers upon the Commerce Commission, formerly the Public Utilities Commission, gen-

eral supervision of all public utilities. It cannot be said to be the intention of the legislature that both the city and the Commerce Commission shall have jurisdiction of this matter. Where the General Assembly enacts a new statute upon any subject and it appears from the new act that it is the legislative intention to make a revision of the whole subject and to frame a new plan or scheme in relation thereto, this is, in effect, a legislative declaration that whatever is embraced in the new statute shall prevail and whatever is excluded therefrom shall be discarded. The revision of the whole subject by the new statute evinces an intention to substitute its provisions for the old law on the subject." (Citing cases.)

The right given to the city to complain to the commission concerning the services of public utilities within the city, the requirement of notice to the city of any hearing relating to the rates or charges for services of public utilities within the city, the right to appear and present evidence upon such hearing and the right of appeal from the order entered, certainly indicated that the Commerce Commission had plenary power over the utility, the conduct of its business and its relations to the public and that no power to exercise any control remained in the city.

The public highways of the State include the streets and alleys in the various municipalities of the State as well as the public roads which lie entirely outside the boundaries of any municipality. The legislature has the entire control of all highways and may delegate the supervision and control of them to any agency which it may deem proper. It may commit the supervision and control of all highways to a single agency and may change that agency from time to time as it sees fit. It may commit the supervision and control of the streets and alleys in cities and villages to the city councils or boards of trustees of the respective municipalities and the supervision and control of the highways which lie beyond the boundaries of any mu-

nicipality to another agency, and it may change from time to time the agency established, either within or without the municipalities. The title to the streets and alleys in cities and villages, whether in fee or by way of easement only, is held by each municipality not for the benefit of the inhabitants of the municipality only, but in trust for the use of the public at large equally with the residents of the municipality, and the State may commit to any agency which it may create for that purpose the entire supervision and control of every part of the highways of the State, or it may divide the supervision and control of the highways as it sees fit. By the creation of the Illinois Commerce Commission, with the comprehensive powers over public utilities which have been mentioned, the legislature withdrew from municipalities in the State the power which they had previously exercised in regard to the use of the streets by such utilities and conferred those powers on the Commerce Commission.

The decree of the circuit court is reversed and the cause is remanded to that court, with directions to overrule the demurrer to the amended bill.

*Reversed and remanded, with directions.*

Mr. JUSTICE STONE, dissenting:

I do not concur in the views expressed in this opinion. In view of the importance of this matter and far-reaching effect of the opinion filed, it is necessary that I set forth at some length the reasons for my dissent.

The correct solution of the main problem involved in this case is, as I view it, to be based on the determination of two propositions: First, whether cities, prior to the passage of the Public Utilities act, had power to permit or deny the use of the streets to public utilities; and second, if so, whether the Utilities act has taken that power from the cities. It may be conceded, as stated in the opinion filed, that cities are creatures of the legislature and possess only

such powers as are conferred by statute. This is well recognized. The Commerce Commission is likewise a creature of the statute and possesses only such powers as the legislature confers. It was argued in the briefs of appellant that in the absence of and prior to any statute on the subject a public carrier of passengers had a permissive right to use the streets for its business, and its use was, therefore, not unlawful. The streets and highways of the State are under the paramount and primary control of the legislature except where that control is limited by the constitution. (*City of Chicago* v. *Kluever,* 257 Ill. 317.) All persons, in the absence of legislative edict, are vested with the right to the use of the streets and highways for travel from one place to another in connection with their business when such use is incidental to that business. This is an ordinary use of the streets and highways and is frequently characterized as an inherent or natural right. No person has an inherent or natural right, however, to make the streets or highways his place of business. Such a use is generally characterized as an extraordinary use. (*Green* v. *City of San Antonio,* 178 S. W. (Tex.) 6; *Hadfield* v. *Lundeen,* 98 Wash. 657; *LeBlanc* v. *City of New Orleans,* 138 La. 243; *Ex parte Dickey,* 85 S. E. (W. Va.) 781; *Desser* v. *City of Wichita,* 96 Kan. 820; *Melconian* v. *City of Grand Rapids,* 218 Mich. 397.) The use of the streets for purely private gain may not be given, even by legislative authority, unless there be also in such use a public service. That the use of motor busses for the public carriage of passengers is an extraordinary or different use from that which the citizen is entitled to make of the street without consent, is of a more dangerous character and may not be exercised without consent, has been recognized by this court and the courts of other States. *City of Chicago* v. *Kluever, supra; Melconian* v. *City of Grand Rapids, supra; Ex parte Dickey, supra; LeBlanc* v. *City of New Orleans, supra; Green* v. *City of San Antonio, supra; Hadfield* v. *Lundeen, supra;*

*Gill* v. *City of Dallas,* 209 S. W. (Tex.) 209; *State* v. *Iams,* 78 Neb. 678.

It is clear from these authorities that a utility of the character of appellant, in the absence of legislative enactment on the subject, has no inherent or natural right to use the streets as a place of business. By section 1 of article 5 of the Cities and Villages act, city councils are given certain numerous powers enumerated in one hundred and two clauses of that section. By the ninth clause cities are given power "to regulate the use of the same," referring to streets. By the one hundred and second clause of the section cities are given power to pass all ordinances, rules and regulations proper or necessary to carry into effect the powers by that act granted. The distinction between ordinary use of the highways which may not be denied, and extraordinary use thereof which may be permitted or denied, has been shown in numerous opinions of this court, and by them it has become well settled law in this State that a city may, under the power of exclusive control of the streets granted to it by the legislature, allow or deny any use of them which is not inconsistent with the public objects for which they are held, and may regulate such use and fix a reasonable compensation to be paid therefor. *Sears* v. *City of Chicago,* 247 Ill. 204; *People* v. *Clean Street Co.* 225 id. 470; *West Chicago Masonic Ass'n* v. *Cohn,* 192 id. 210; *Chicago Municipal Gas Light Co.* v. *Town of Lake,* 130 id. 42; *City of Chicago* v. *Trotter,* 136 id. 430; *City of Quincy* v. *Bull,* 106 id. 337; *Gridley* v. *City of Bloomington,* 68 id. 47; *Nelson.*v. *Godfrey,* 12 id. 20.

From these authorities it cannot be doubted that in the condition of the law prior to the enactment of the Public Utilities act cities had a right to permit or deny the use of the streets by public utilities. Prior to such enactment they had also the power to regulate the business of utilities conducted on the streets.

Has the power to control the use of the streets been taken away by the Utilities act? The purpose of the Utilities act, as has been many times shown in the construction of the act by the opinions of this court, is to regulate the service of public utilities. The act is sustained on the ground that it is a proper exercise of the police power. (*City of Chicago* v. *O'Connell*, 278 Ill. 591; *Schiller Piano Co.* v. *Illinois Northern Utility Co.* 288 id. 580.) The public interest in utilities is primarily in the service and not in the use of a given street or highway by such utility. The police power arises not so much out of the place of operation of these utilities as from the character of the service given and rates charged by them. Steam railroads, operating upon their own right of way, are nevertheless within the Public Utilities act because of the public interest in the service they render and the benefit to the public of regulating that service. The Public Utilities act is not primarily an act to regulate the use of streets and highways. There is no direct provision of the act empowering the Commerce Commission so to do. The Public Utilities act is comprehensive legislation designed to take over the regulation and control of public utilities.

The opinion filed, as I view it, confuses the powers to regulate the use of the streets specifically conferred on cities by the ninth clause of section 1, article 5, of the Cities and Villages act with the power conferred on the Commerce Commission to regulate the business of public utilities. There is no language in the act expressly repealing this clause of the Cities and Villages act. It has always been the rule in this State that repeals by implication are not favored. Whether the power given under an act arises from express words of the statute or by necessary implication, the power exists, and the courts are no more favorable to a repeal by implication of the latter than they are of the former. The Utilities act therefore cannot be said to have repealed said clause 9 of the Cities and Villages act as

relates to utilities unless there appear in the former act provisions necessarily repugnant to and inconsistent with clause 9. Section 8 of the Utilities act provides: "The commission shall have general supervision of all public utilities, except as otherwise provided in this act, shall inquire into the management of the business thereof and shall keep itself informed as to the manner and method in which the business is conducted." Supervision is generally defined as the act of overseeing, or superintending, or inspecting. The various sections of the Public Utilities act specify of what this supervision is to consist. Under section 9 it is required that the public utility comply with the requests and orders of the commission. Section 55 provides: "No public utility shall begin the construction of any new plant, equipment, property or facility which is not in substitution of any existing plant, equipment, property or facility or in extension thereof or in addition thereto, unless and until it shall have obtained from the commission a certificate that public convenience and necessity require such construction. No public utility not owning any city or village franchise nor engaged in performing any public service * * * and not possessing a certificate of public convenience and necessity from the State Public Utilities Commission or the Public Utilities Commission, at the time this act goes into effect shall transact any business in this State until it shall have obtained a certificate from the commission that public convenience and necessity require the transaction of such business. Whenever after a hearing the commission determines that any new construction or the transaction of any business by a public utility will promote the public convenience and is necessary thereto, it shall have the power to issue certificates of public convenience and necessity. * * * Unless exercised within a period of two years from the grant thereof authority conferred by a certificate of convenience and necessity issued by the commission shall be null and void. No certificate of public convenience and

necessity shall be construed as granting a monopoly or an exclusive privilege, immunity or franchise." Section 55a provides for a bond and sworn statement of ability to pay damages. By section 29 it is provided that no franchise, license, permit or right to own, operate or control a public utility shall be assigned, transferred or leased unless the same shall have been approved by the commission. "Such permission shall not be construed to revive or validate any lapsed or invalid franchise, license, permit or right, or to enlarge or add to the powers and privileges contained in the grant of any franchise, license, permit or right, or to waive any forfeiture."

The right of municipalities to consent to or deny the use of the streets by utilities has been recognized by this court since the passage of the Public Utilities act. (*People v. Chicago Motor Bus Co.* 295 Ill. 486; *City of Springfield v. Interstate Telephone Co.* 279 id. 324.) That the legislature did not intend by the Public Utilities act to place this power in the Commerce Commission is further evidenced by the act of 1917, known as the Sixty Million Dollar Bond Issue act. (Laws of 1917, p. 696.) Section 12 of that act provides that the control and maintenance of the highways of the State under the system there established shall be and remain under the jurisdiction and control of the Department of Public Works and Buildings; that "no public utility company or person shall be granted any right, privilege or franchise in, on or along any such highway without the consent of said Department of Public Works and Buildings." Likewise in the act of June 29, 1923, (Laws of 1923, p. 537,) the same provision is found with reference to the roads included in the One Hundred Million Dollar Bond Issue act. It is likewise worthy of note that section 38 of the Road and Bridge act (Smith's Stat. 1927, p. 2349,) provides as to a large number of public utilities that they shall not have the right to locate or construct roads or place poles or wires or lay pipe lines along

any State aid road without the consent of the county board of the county where it is proposed to place the same. It is also by that section required that the county board shall receive the approval of the State highway commission to so use the roads before the consent of such board shall become effective. There is no provision of the Public Utilities act which either expressly or by necessary implication repeals the provisions giving to cities the power to regulate the use of streets, and a certificate of convenience and necessity cannot be said to be a license to a public utility to use the streets. The result of the holding of the opinion here filed is to place the Utilities act in direct conflict with the acts just referred to. Obviously, if the power to regulate utilities carries with it the power to say whether they shall use certain streets or highways as a place of business, the powers granted to the Department of Public Works in one case and the county boards in the other do not exist.

It is held in the opinion filed that it is the purpose, as shown by the act, to turn the complete control of the matter of regulating public utilities, and the use of the streets by same, over to the Commerce Commission, and that it is inconsistent that the power to permit or deny the use of streets by a utility be retained by the city. We have repeatedly held that the Public Utilities act covers the whole subject of utility regulation and that by it the State has recalled such power from the cities. (*Chicago North Shore and Milwaukee Railroad Co.* v. *City of Chicago,* 331 Ill. 360; *Northern Trust Co.* v. *Chicago Railways Co.* 318 id. 402; *Village of Atwood* v. *Cincinnati, Indianapolis and Western Railroad Co.* 316 id. 425.) No former opinion of this court, however, has held that power to regulate utilities includes the power to permit or deny the use of streets or that the two powers are inconsistent. In *Chicago North Shore and Milwaukee Railroad Co.* v. *City of Chicago, supra,* the opinion especially points out that "the question here involves the power to regulate the operation

of certain railroads now in the streets of the appellee city, and neither the consent of the city to the use of the streets nor the charter contracts of these railroads is involved." In none of these cases cited has power of the city to regulate the use of the streets been brought directly into question. In *City of Chicago* v. *O'Connell, supra,* this court considered a bill of the city of Chicago seeking to restrain the Public Utilities Commission from enforcing a certain order relating to equipment and operation of street cars in the city of Chicago. In that case the distinction between the regulation of the utility and the power to consent to the use of the streets is clearly drawn. Section 4 of article 11 of the constitution prohibits any act of the legislature permitting the construction and operation of a street railway on the streets of a city without the consent of the city. The question was whether the Utilities act contravened these constitutional provisions, and it was held that the act conferring on the Public Utilities Commission the power to regulate the utility was in no way inconsistent with the power reserved to the cities to consent to or deny the use of the streets by such utility. A distinction in principle between that case and the case at bar, as to this point, does not exist. No provision of the Utilities act expressly takes away the power of the city to consent to or deny the use of the streets by a public utility or grants powers to the Commerce Commission inconsistent with the exercise of such powers by the city, and in no case prior to the one at bar has it ever been so held. The opinion filed holds that the rights conferred on cities to regulate the use of the streets was withdrawn by the passage of the Utilities act, and that thereby clause 9 of section 1 of article 5 of the Cities and Villages act, so far as it relates to this subject, was repealed because inconsistent with the Utilities act enacted later. By the same token it must be said that said clause 9 of the Cities and Villages act, having been re-enacted in 1925 and again in 1927 in its original language, supersedes the in-

consistent provisions of the Utilities act, if any existed. This is an undoubted rule of statutory construction and requires no citation to support it. I am of the opinion, however, that there is no inconsistency requiring a holding by this court that the said clause 9 of the Cities and Villages act was repealed by the Public Utilities act.

This case is one of very great importance. The motor bus method of transportation in this State is an important one and is entitled to fair consideration at the hands of the law-makers. This court, however, has no authority to legislate, as the opinion filed seems to me to do. The holding in this opinion cannot be confined to motor bus utilities but must extend to every kind of public utilities and to all use by them of the streets. Clearly, if the power to control the use of the streets has been taken away as to all utilities except street railways which are within the provisions of the constitution, then no city has power to require compensation for the use of the streets or to say what streets may be so used, though the city is required to police the streets to protect the public. Surely such a construction of the act should rest on a more solid foundation if repeal by implication is to be found. It is stated in the opinion that the fact that the Utilities act permits cities to complain to the Commerce Commission regarding the service of utilities indicates that plenary power over the utilities has been given to the Commerce Commission and that no power to exercise any control remains in the city. Section 64 of the Public Utilities act gives the city a right to complain as to rates or the service rendered, and as to that service it is clear that the city can exercise no control. As I view it, such provision of the act, instead of indicating a complete removal of the power from the city, shows the extent of the power granted to the Commerce Commission to be limited to the regulation of the business of the utility. No suggestion appears as to a right in the city to complain to the commission as to what streets are to be used or whether

any may be used by the utility. It seems clear that the matter was left to the city, where it has rested since the first passage of the Cities and Villages act. Section 65 of the act provides that "in any matter concerning which the commission is authorized to hold a hearing upon complaint or application or upon its own motion, notice shall be given to the public utility and to such other interested persons as the commission shall deem necessary," in the manner provided by the act. The act makes no express provision for notice to cities of hearings on applications for a certificate of convenience and necessity by a public utility which desires to operate in such city. This indicates an intention on the part of the legislature that a matter so vital to the city as the control of the use of the streets is to remain within the powers of the city.

Mr. JUSTICE HEARD: I fully concur in the foregoing dissenting opinion.