No. 33,338

Everett Ash et al., *Appellees*, v. E. V. Gibson et al., *Appellants*.

(67 P. 2d 1101)

Opinion filed May 8, 1937.

*R. R. Redmond*, of Ottawa, for the appellants.

*Arthur L. Claussen* and *Richard B. McEntire*, both of Topeka, for the appellees.

*Earle W. Evans, Joseph G. Carey, W. F. Lilleston, Claude I. Depew, W. E. Stanley, Lawrence Weigand* and *George Stallwitz*, all of Wichita, as *amici curiae*.

The opinion of the court was delivered by

Smith, J.: This was an action to enjoin the enforcement of an ordinance of the city of Ottawa. Judgment was for plaintiffs. Defendants appeal.

The ordinance sought to be enjoined is as follows:

"Section 1. It shall be unlawful for any person, firm or corporation to transport gasoline, naphtha, kerosene, distillate, oil or other inflammable or explosive oil derivatives into or through the city of Ottawa, Kansas, by means of motor vehicle, motor truck or combination of motor truck and trailer or other vehicle, over and upon any of the streets, avenues or alleys of said city of Ottawa, Kansas, lying west of Lincoln street and north of Fifteenth street; provided, that this section shall not apply to or restrict the transportation of such commodities in railroad tank cars upon tracks maintained through said city or to the transportation of such commodities into or through said city in quantities of six hundred (600) gallons or less.

"SECTION 2. That any person, firm or corporation violating the terms of this ordinance shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined in a sum of not less than five dollars ($5) nor more than one hundred dollars ($100).

"SECTION 3. That due to the menace to the public safety of life and property in said city, an emergency is hereby declared to exist and this ordinance shall take effect and be in force immediately upon its passage and publication according to law."

The petition, after the formal allegations identifying the parties, alleged that the plaintiffs were engaged in the business of transporting liquid petroleum fuel, which included gasoline, kerosene, distillate and naphtha, over the highways of the state, and that certain of the plaintiffs were engaged in such transportation in interstate commerce from the states of Kansas and Oklahoma into the states of Missouri, Nebraska, and Oklahoma, and that in the regular course of their business it was necessary for plaintiffs to transport these commodities into and through the city of Ottawa.

The petition then alleged that in much of the transportation in which plaintiffs were engaged the only direct route that plaintiffs could follow was along highway 59, which is both a federal and state highway, and which runs through the city of Ottawa; that in order for plaintiffs to operate their business and not go through Ottawa it would be necessary to make a detour requiring plaintiffs to travel an additional distance of from fifty to sixty miles.

The petition then alleged that the loss of time and expense incurred by this detour would be so great as to render it impractical and impossible for plaintiffs to carry on this business; and that as a result of this detour plaintiffs would be forced to pay additional wages for drivers and it would result in great delay and loss of time in delivering gasoline to its destination; that it would result in loss of contracts so that plaintiffs would suffer irreparable loss.

The petition then alleged that in the course of transporting commodities as alleged the plaintiffs had invested large sums for equipment with which to carry on their business; that the defendants had known of the business in which plaintiffs were engaged and that plaintiffs were transporting gasoline through Ottawa; that the plaintiffs, relying on the acquiescence of defendants in the free and unlimited use of the streets by plaintiffs, had invested large sums of money for equipment; that the business had grown until 25 percent of all gasoline transported within the state was moved by motor truck.

The petition then contained an allegation that the city was without authority to pass the ordinance for the reason that there is no such power vested in the governing body of the city by the legislature, in express terms, as incident to the powers granted to such governing body, nor could such power be fairly implied.

The petition then alleged that the ordinance was unreasonable and oppressive, did not operate on all classes alike, and was not fair, general and impartial; that the ordinance undertook not to regulate but to prohibit; that it undertook to make criminal that which is not criminal; that the ordinance sought to prohibit only those persons who are engaged in the transportation by motor truck of the commodities mentioned, and it did not seek to regulate or prohibit any other type of motor transport trucks, and by the express terms of the ordinance it exempted railroad carriers of the described commodities.

The petition further alleged that the ordinance was unconstitutional in that it violated the fourteenth amendment to the constitution of the United States and article I of the bill of rights of the constitution of the state of Kansas because it deprived plaintiffs of their property without due process of law. The prayer of the petition was for a judgment enjoining defendants from enforcing the statute, and declaring the ordinance unconstitutional and void.

The answer of the city officials admitted the passage of the ordinance and that it was in full force and effect. The answer further alleged that the transportation business carried on by plaintiffs over the streets of the city was a part of the general traffic; that the transportation of the commodities named over the streets of the city was a dangerous and obnoxious business; that the business of transporting the commodities sought to be regulated is inherently dangerous to the general public and to the city and its trade and commerce; that plaintiffs and others similarly situated had been carrying on their business by means of large transport trucks transporting their cargoes as a part of the general traffic of the city in quantities of 2,000 to 5,000 gallons, depending upon the size of their equipment; that the transport cargoes would average from six to fifteen tons in weight; that these trucks are heavy, cumbersome and unwieldy.

The answer next contained allegations as to accidents that had occurred in Ottawa, involving large gasoline trucks, that would not have been harmful to the public had the trucks not been so large.

The answer next contained allegations that Ottawa is a city of the second class and that the ordinance in question was enacted by virtue of the authority vested in the city by the city by G. S. 1935, 14-401, 14-418, 14-420, 14-421, 14-422, 8-125, 12-848 and 14-439, which statutes confer authority on the governing body of the city to enact ordinances, rules, regulations and bylaws that may be expedient for maintaining the peace and welfare of the city.

The answer then alleged that the ordinance was reasonable and that in the honest judgment of the defendants the safety of limb and life and property of the inhabitants of the city and the general welfare of the city demanded the regulations imposed in the ordinance. The reply was a general denial.

A restraining order was issued against the city officials when the action was begun, restraining them from enforcing the ordinance. Later at a hearing on the merits a permanent injunction was allowed. This appeal is from that judgment.

There was no testimony introduced before the trial court, but the parties stipulated as to what the facts were. That stipulation, omitting the portion identifying the parties, was as follows:

"That said ordinance went into effect on July 30, 1936, and has been in full force and effect from that date to the present time except for the temporary injunction heretofore granted by the court in the above-entitled action.

"10. That under the provisions of said ordinance the said plaintiffs cannot operate their loaded transport trucks into and through the city of Ottawa, Kansas, and that as long as the provisions of said ordinance are being enforced it is necessary for these plaintiffs to detour around the city of Ottawa, Kansas. That the ordinance as enacted by the governing body of the city of Ottawa, Kansas, was enacted as a direct result of two disastrous fires caused by overturning of loaded transport trucks carrying gasoline, distillate or kindred products upon the streets of said city and on highways immediately adjacent thereto, within a few days prior to the passage of said ordinance, which fires resulted in the deaths of three persons and large property damage. That said ordinance was enacted in good faith by the governing body of said city. That the detour to the west is by highway No. 75, through Topeka, Kansas, or to the east by highway 169 by way of Paola and Olathe, Kansas. That either of these routes is about sixty miles long and requires about three hours more to travel than the direct route over highway No. 59. That if the plaintiffs are required to follow these detour routes it will be necessary for them to either increase their equipment and employees, and thereby increase their cost of operation or to reduce their number of trips and their present equipment and employees, and thereby reduce their income. That the plaintiffs have contracts with various individuals, firms and corporations to perform services of transporting various liquid petroleum fuel products, which contracts they are bound to fulfill. That they will suffer severe pecuniary loss in the fulfillment

of such contracts if they are obliged to detour around the city of Ottawa, Kansas.

"11. That highway No. 59, that runs into and through the city of Ottawa, Kansas, has been designated as both a state and a federal highway. That these plaintiffs have been conducting said business for a number of years over said highway with the full knowledge of the defendants and that said business has gradually grown and developed. That the trucks and equipment of the plaintiffs are not suitable for the transportation of any other commodities than that for which they are now being used.

"That the plaintiffs cannot profitably operate their transport trucks along said road and over highway No. 59 and through the city of Ottawa, Kansas, transporting the above commodities in less than 600-gallon-per-truck loads."

The city officials are the appellants in this case, but since the plaintiffs are attacking the validity of the ordinance we shall consider the arguments against its validity as they are made in plaintiff's brief.

The first argument of plaintiffs is that the city had no authority, express or implied, to pass the ordinance. Plaintiffs first state a rule with which we can all agree, as follows:

"The power to pass a city ordinance must be vested in the governing body of the city by the legislature in express terms, or be necessarily or fairly implied in and incident to the powers expressly granted, and must be essential to the declared purposes of the corporation—not simply convenient, but indispensable. . . . Any fair and reasonable doubt concerning the existence of the power is resolved by the courts against the corporation, and the power is denied. Powers encroaching upon the rights of the public or of individuals must be plainly and literally conferred by the charter. . . ." (*Anderson v. City of Wellington,* 40 Kan. 173, 176, 19 Pac. 719.)

Plaintiffs then point out that if the city has the authority claimed it must derive it from G. S. 1935, 14-401, 14-418, 14-421, 14-439, 12-848, 8-124, 8-125, 14-432 and 68-155.

G. S. 1935, 14-401, provides as follows:

"The governing body of each city governed by this act shall have the care, management and control of the city and its finances, and shall have power to enact, ordain, alter, modify or repeal any and all ordinances not repugnant to the constitution and laws of this state, and such as it shall deem expedient · for the good government of the city, the preservation of the peace and good order, the suppression of vice and immorality, the benefit of trade and commerce, and the health of the inhabitants thereof, and such other ordinances, rules and regulations as may be necessary to carry such power into effect."

G. S. 1935, 14-418, provides as follows:

"The council may also restrain and prohibit riots, routs, noises, assaults, assaults and batteries, petty larceny, disturbances or disorderly assemblies, and immoral or indecent shows, exhibitions or concerts, in any street, house or

place in the city; and regulate, punish and prevent the discharge of firearms, rockets, powder, fireworks, or other dangerously combustible material in the streets, lots, grounds, alleys, or about or in the vicinity of any buildings."

### G. S. 1935, 14-421, provides, in part, as follows:

"The council may . . . prescribe limits within which no dangerous nor obnoxious and offensive business may be carried on . . ."

### G. S. 1935, 14-439, provides, in part, as follows:

"For any purpose or purposes mentioned in the preceding sections, the council shall have power to enact and make all necessary ordinances, rules and regulations, and they shall also have power to enact and make all such ordinances, bylaws, rules and regulations not inconsistent with the laws of the state as may be expedient for maintaining the peace, good government, and welfare of the city and its trade and commerce."

### G. S. 1935, 12-848, provides as follows:

"The streets, alleys, public parks and grounds in cities of the second and third classes in the state of Kansas shall be under the control of the governing body of the municipalities thereof, and the jurisdiction over and the control thereof is vested in said cities."

### G. S. 1935, 8-124, provides as follows:

"Cities of the first, second and third class shall have the power by local ordinance to regulate and control the use and speed of automobiles and motor vehicles within the corporate limits of said cities and to prescribe the penalties for the violation thereof; such ordinance not to be inconsistent or repugnant to the provisions of this act."

### G. S. 1935, 8-125, provides:

"That the governing body of any city is hereby authorized to pass ordinances regulating the kind, size of tread, weight, and direction of travel of vehicles which may use any particular street, alley or other public property, and to prescribe routes by which vehicles of a weight of more than five thousand (5,000) pounds with or without load shall move through the streets in said city, and prescribe suitable penalties for the violation thereof."

### G. S. 1935, 14-432, provides as follows:

"Cities of the second class are hereby authorized and empowered to pass ordinances fixing a maximum schedule of rates for the carriage for hire of persons and property, other than railroads operated by steam or electricity and to prescribe such measures as may be necessary for the protection of strangers and the traveling public in person and property."

### G. S. 1935, 68-155, provides as follows:

"Local authorities in their respective jurisdictions may cause appropriate signs to be erected and maintained, designating residence and business districts, highway and steam or interurban railway grade crossings and such other signs as may be deemed necessary to carry out the provisions of this act, and such additional signs as may be appropriate to give notice of local parking

and other special regulations. Local parking and other special regulations shall not be enforceable against an alleged violator if, at the time and place of the alleged violation, an appropriate sign giving notice thereof, is not in proper position and sufficiently legible to be seen by an ordinary observant person."

Plaintiffs then point out the fact which is undisputed that nowhere in the above statutes is power conferred on the governing body of the city in express terms to prohibit the transportation of gasoline products. Plaintiffs then point out the well-settled principle of law that a power once granted to a city by the state legislature can be taken away from the city by a subsequent enactment.

From that point plaintiffs refer to the constitutional amendment wherein the people of the state provided for a uniform system of highways and the statutes enacted pursuant to this amendment providing for the creation of the system and for regulation and control of traffic over it. There are in force a number of statutes dealing with transportation of gasoline.

G. S. 1935, 55-506, 55-507, 55-508, 55-509 and 55-510, deal with this subject.

G. S. 1935, 55-506, provides:

"This act is for the purpose of aiding in the administration and enforcement of the motor-fuel laws of this state, and shall be deemed to be supplemental to and a part of such laws."

G. S. 1935, 55-507, provides:

"No person shall transport any liquid fuels or motor-vehicle fuels in lots or quantities of more than one hundred and twenty gallons, over any of the public highways of this state, without having secured from the oil inspector, and at the time holding, a valid and subsisting liquid-fuels carrier's license for each vehicle in which such person transports such fuels. . . ."

G. S. 1935, 55-508, provides:

"Any person who shall desire to transport any liquid fuels or motor-vehicle fuels over the public highways of this state may make sworn application to the oil inspector for a motor-vehicle-fuels carrier's license or licenses, on forms prepared and to be furnished by the oil inspector and containing the information required by him, and accompanied by the bond in this chapter provided for, and a fee of one dollar for each license applied for; and the oil inspector, upon finding such application and bond to be in compliance with law, shall issue to such applicant the number of motor-vehicle-fuels carrier's licenses applied for, but not exceeding one for each vehicle owned and to be used by the applicant in such transportation business. Each such license shall be numbered and dated, shall show the name and address of the person to whom it is issued and shall fully identify the vehicle in which it shall authorize motor-vehicle fuels to be transported. Such license shall not be as-

signed or transferred, and shall expire one year from its date, unless sooner suspended or revoked. The oil inspector may suspend or revoke any such motor-vehicle-fuels carriers' license or permit for any violation of the motor-fuel-tax laws of this state, or the rules or requirements of the oil inspector, by such licensee or permittee or his agent or employee, upon the same conditions of notice and hearing as are provided in case of distributors' licenses."

G. S. 1935, 55-509, provides:

"Before the oil inspector shall issue any motor-vehicle-fuels or liquid-fuels carriers' license or licenses he shall take from the applicant, in addition to the liability insurance required by the motor-carriers act of this state, a penal bond in favor of the state of Kansas, with corporate surety authorized to do business in this state in the sum of one thousand dollars ($1,000), conditioned that such applicant or licensee will comply with all the provisions of this act, and will not deliver any liquid fuels transported by him to any other person or place than those designated in the bill of sale or bill of lading carried or used by him, and that no seal or seals placed on any vehicle or container used by him in such transportation business shall be broken or tampered with until the liquid fuels contained in such vehicle or container reach the designated point of destination or leaves this state at the designated point, and further conditioned that such applicant or licensee will not assist, aid or abet any person in unlawfully evading any Kansas motor-fuel taxes. The oil inspector may require any such carrier to furnish additional bond at any time he deems it necessary, and such bond shall be promptly furnished."

G. S. 1935, 55-510, provides:

"Any person desiring to transport, exclusively for the holder of a distributor's license, or a dealer of motor-vehicle fuels upon which the motor-vehicle-fuels tax of this state has been paid, may, upon making application to the oil inspector, on a form to be prescribed and furnished by such inspector, be granted a permit to retail gasoline from a truck, tank wagon or vehicle within a radius of twenty-five miles from the town or city where said distributor or dealer has his place of business: *Provided,* That the oil inspector may, where the conditions and circumstances warrant, increase the radius distance up to forty miles. Before the oil inspector grants such permit he must receive from the applicant a fee of one dollar and a bond in the sum of five hundred dollars, conditioned that such person will comply with all the motor-vehicle-fuel tax laws of this state and the rules and regulations of the oil inspector, state fire marshal and the public service commission respecting the handling, selling and transportation of liquid fuels and motor-vehicle fuels. Such bond shall be executed by a surety to be approved by the oil inspector: *Provided,* That no bond shall be required of a distributor who has complied with the provisions of the motor-fuels law of the state. Such permit shall be good for one year from its date unless sooner suspended or revoked as is hereinbefore provided in the case of liquid-fuels carrier's licenses."

Plaintiffs refer to G. S. 1935, 66-1,108, defining terms, and G. S. 1935, 66-1,112, conferring on the public service commission the au-

thority to license, supervise and regulate motor carriers; 66-1,112a, contract motor carrier permits; 66-1,129, which gives the commission authority to make safety rules and regulations for motor carriers and G. S. 1935, 79-3401, which is the motor-fuel tax statute.

The argument of plaintiffs that the governing body of the city did not have authority to enact the ordinance in question is based on decisions to the effect that where a city ordinance is in conflict with the state statute the state statute must govern and the ordinance is void.

The question of the degree of self-government that shall be invested in local communities is older even than our government. Early in the history of this country the local unit was the town. At any rate, since the founding of our state the legislative policy has been to confer on the cities the right of self-government in such large measure that it amounts to the possession of police power where the safety, health and general welfare of its people are concerned. This power is conferred by means of the various statutes dealing with that subject which have been heretofore quoted in this opinion. (See *Service Oil Co. v. City of Marysville*, 117 Kan. 514, 231 Pac. 1031.)

The only limitation on it is that it must be exercised in a reasonable manner. (See *Standard Oil Co. v. Marysville*, 279 U. S. 582, 73 L. Ed. 856.) There are two views to take of this question. One is the traditional view that this right is a precious thing inherent in the rights of man generally. We have seen that this view has been entertained generally by the people of our race for many years. The other view is that it is a practical necessity in order to make our form of government work at all, extending as it does over a wide expanse of territory and touching widely different situations and communities. Considering the present situation, it can readily be seen that a general statute could not adequately and efficiently cover the movement of gasoline in trucks through every city of the state. In some cities an ordinance could be passed routing the trucks through a sparsely settled portion of the city where the danger of damage from an explosion would be relatively slight. So a limitation of the amount of the load would not need to be put into effect. In some other cities some other way might be devised to meet the situation. The business in which plaintiffs are engaged is a comparatively new one and it is not surprising that different cities in

the state have different ideas as to how best to regulate it within their borders.

Before this court would hold that the adoption of the highway amendment, and the enactment of the statutes pursuant thereto, had taken away from the cities of the state the right to regulate a business as dangerous as the transportation of gasoline through these cities, it would have to appear clearly from the statutes by plain provisions that such was the intent of the legislature. We have looked for such provisions and fail to find them. We are compelled to reach the conclusion that the problem of regulating this traffic on the highways outside the cities is one thing and the regulation of it within the limits of a city is another and that the latter is within the province of the governing bodies of the cities.

Plaintiffs next argue that the ordinance is unreasonable and discriminatory, and an arbitrary prohibition of the use of the highway. On this point the argument is that the ordinance in effect compels plaintiffs to detour around the city of Ottawa with their loaded trucks so that they are prohibited from the use of the streets of the city. Many authorities are cited and relied upon holding that the power to regulate does not include the power to prohibit. In this connection it should be pointed out that the stipulation as to the facts does not state that the enforcement of the ordinance will stop the traffic in which plaintiffs are engaged. It only states that if the ordinance is enforced it will cause them to incur expense which they did not contemplate at the time they entered into certain contracts with persons for whom they are now transporting gasoline.

The plaintiffs are claiming the right to use the highways of the state and the streets of the city for the purpose of transporting goods for hire. They have no inherent right to so use the streets. (See *Peoples Taxicab Co. v. City of Wichita,* 140 Kan. 129, 34 P. 2d 545, and cases cited.)

If the ordinance is a reasonable exercise of the police power of the city the fact that its enforcement makes it a financial burden on plaintiffs does not render it void. This brings us to a consideration of whether the ordinance is reasonable. On this question we receive some light from decisions of the supreme court of the United States. In *Standard Oil Co. v. Marysville,* 279 U. S. 582, 73 L. Ed. 856, the court was considering the validity of an ordinance that required all gasoline tanks of more than ten gallons capacity to be buried three feet under ground. The court said:

"The master found that gasoline and kerosene stored in large quantities are dangerously inflammable substances, as we judicially know (*Pierce Oil Corporation v. City of Hope*, 248 U. S. 498, 500), which, when ignited, are a menace to life and property in the vicinity; that even with the use of the most modern safety devices, fires or explosions of such storage tanks occur and that within the four years preceding the trial five disastrous fires of gasoline storage stations had occurred in Kansas, in two of which gasoline tanks had exploded, in one case striking and burning a building 475 feet away, killing nine people, wounding twenty-six more and burning several other houses. His findings show that within an even smaller radius from petitioners' tanks, or within the same or adjacent blocks, there are many buildings, including residences, a hotel, warehouses and garages, some of wooden structure, and gasoline and kerosene storage tanks of 75,000 gallons capacity, and that the principal business street of the town is within two blocks of the Standard tanks. From local conditions and recent public improvements the master found it reasonable to conclude that there would be increased residential building in the vicinity." (p. 584.)

This court considered the validity of the same ordinance in *Service Oil Co. v. City of Marysville*, 117 Kan. 514, *supra*. In that case this court stated it would take judicial notice of the same fire spoken of by the supreme court of the United States when considering the same ordinance. The stipulation in this case refers to two disastrous fires that occurred in Ottawa prior to the enactment of the ordinance as the result of the overturning of two transport trucks loaded with gasoline. In addition to the statement in the stipulation this court will take judicial notice of the fact that a cargo of gasoline moving along the streets of a city in a truck subject to traffic hazards and to the physical frailties of the driver is more dangerous to the people of the city than the same amount of gasoline in a stationary tank.

A truck is propelled by an internal combustion engine and in such an engine there is always some fire present. Whenever an accident occurs there need be only the ignition of the escaping fumes by a heated pipe or some other part of the engine to cause a fire or explosion. Care on the part of the driver of the gasoline truck will not meet the situation. A collision caused by the negligence of the driver of some other vehicle on the street would result in just as disastrous consequences to inhabitants of the city as though it had been caused by the negligence of the driver of the truck. The unusual hazard sought to be avoided is the presence of the large amount of this dangerous substance on the streets. Obviously the fact that the prohibition of such a dangerous condition will result in loss to the plaintiffs does not affect the reasonableness of the

manner in which the governing body of the city in the exercise of its best judgment sees fit to deal with the situation. In this connection it is of interest to note that the stipulation as to the facts states what is no doubt true, that is, that the ordinance was enacted in good faith by the governing body of the city.

Plaintiffs next argue that the ordinance is a burden on intrastate and interstate commerce. It is admitted by everybody that some of the traffic handled by plaintiffs through Ottawa moves in interstate commerce. On this point plaintiffs cite and rely on authorities holding that a state or municipality of a state cannot fetter the right to carry on interstate commerce within the borders by imposing conditions or regulations which are unnecessary and which pass beyond the bounds of what is reasonable and suitable for the proper exercise of its powers. From what has already been said in this opinion, it is plain that we hold that the ordinance in question is a reasonable exercise of the powers of the city. In *Buck v. Kuykendall*, 267 U. S. 307, 69 L. Ed. 623, the supreme court of the United States was considering an action that had been brought to enjoin the enforcement of a statute which provided that a common carrier for hire could not use the highways with auto vehicles between fixed termini or over regular routes without having first obtained from the director of public works a certificate declaring that public convenience and necessity required such operation. The highest court of the state had construed the section as applying to common carriers engaged exclusively in interstate commerce. A certificate had been refused on the ground that under the laws of the state the certificate should not be granted for any territory which was already being adequately served by the holder of a certificate and that the territory in question was already adequately served. The court held that as so construed the statute was a violation of the interstate commerce clause. The court said, however:

"It may be assumed that section 4 of the state statute is consistent with the fourteenth amendment; and also, that appropriate state regulations adopted primarily to promote safety upon the highways and conservation in their use are not obnoxious to the commerce clause, where the indirect burden imposed upon interstate commerce is not unreasonable." (p. 315.)

In *Kane v. New Jersey*, 242 U. S. 160, 61 L. Ed. 222, and *Hendrick v. Maryland*, 235 U. S. 610, 59 L. Ed. 385, the court considered statutes of states requiring compliance with the laws of the state by residents of other states using the highways of the state. In the Hendrick case the court said:

"In the absence of national legislation covering the subject a state may rightfully prescribe uniform regulations necessary for public safety and order in respect to the operation upon its highways of all motor vehicles—those moving in interstate commerce as well as others." (p. 622.)

In this case the decision of the court in *Smith v. Alabama,* 124 U. S. 465, 31 L. Ed. 508, was cited and approved. In that case the court upheld a state statute forbidding any engineer to operate a railroad train without first undergoing an examination touching his fitness and obtaining a license for which a fee was charged. On this point the court said:

"But the provisions on the subject contained in the statute of Alabama under consideration are not regulations of interstate commerce. It is a misnomer to call them such. Considered in themselves, they are parts of that body of the local law which, as we have already seen, properly governs the relation between carriers of passengers and merchandise and the public who employ them, which are not displaced until they come in conflict with express enactments of congress, in the exercise of its power over commerce, and which, until so displaced, according to the evident intention of congress, remain as the law governing carriers in the discharge of their obligations, whether engaged in the purely internal commerce of the state or in commerce among the states." (p. 480.)

In the Kane case the court cited with approval the language already quoted from the Hendrick case. To the same effect is the holding in *Peoples Rapid Transit Co. v. Atlantic City,* 105 N. J. L. 286, 144 Atl. 630, also *Garneau v. Eggers,* 113 N. J. L. 245, 174 Atl. 250.

The ordinance in question is a valid exercise of the police power of the city, and its effect on interstate commerce is only incidental to its object, the protection of the lives and property of the inhabitants of the city.

The plaintiffs do not press the argument in their brief that the ordinance is void because it deprives them of their property without due process of law. What has already been said is an answer to that proposition.

An able brief of *amici curiae* was filed in this action. This brief takes up the cudgels on the part of plaintiffs. One argument urged is that the ordinance is inconsistent with the policy of the state as declared in its laws. The gist of this argument is that by the enactment of G. S. 1935, 55-507, 55-508 and 55-510, which have been quoted already in this opinion, the legislature has adopted a policy with which this ordinance is inconsistent, and to which it is repugnant. These statutes have been considered by us together with the

fact that the state fire marshal has issued rules and regulations as to equipment and management of trucks being used in transporting gasoline along the highways of the state. We do not find in them that denial of police power necessary to confer authority to enact the ordinance in question which we have held was necessary to deprive city governing bodies of their authority.

The next argument in this brief is that the ordinance does not bear any real or substantial relationship to the general welfare of the people. What we have already said is an answer to that argument.

Plaintiffs do not press the argument in their brief that the ordinance expressly excludes from its provisions gasoline being moved by rail and hence is an unreasonable discrimination. We have examined this question, however, and have concluded that there is enough difference in the conditions under which the two kinds of traffic move that the distinction is not an unreasonable one.

The judgment of the trial court is reversed with directions to set aside the injunction granted, and to enter judgment for defendants.

ALLEN, J. (dissenting): Although the city may have had the power to pass the ordinance, I am persuaded it was withdrawn by our statutes creating the state highway system. In *Chicago Coach Co. v. City of Chicago*, 337 Ill. 200, 169 N. E. 22, 66 A. L. R. 834, the question before the court was whether the city of Chicago could prohibit the operation on its streets of motor buses as common carriers of passengers by a public utility which had obtained a certificate of public convenience from the Illinois Commerce Commission. While that case dealt with a public utility, the reasoning of the court is applicable to the situation before us. The court said:

"The public highways of the state include the streets and alleys in the various municipalities of the state, as well as the public roads which lie entirely outside the boundaries of any municipality. The legislature has the entire control of all highways and may delegate the supervision and control of them to any agency which it may deem proper. It may commit the supervision and control of all highways to a single agency, and may change that agency from time to time as it sees fit. It may commit the supervision and control of the streets and alleys in cities and villages to the city councils or boards of trustees of the respective municipalities, and the supervision and control of the highways which lie beyond the boundaries of any municipality to another agency, and it may change from time to time the agency established, either within or without the municipalities. The title to the streets and alleys in cities and villages, whether in fee or by way of easement only,

is held by each municipality, not for the benefit of the inhabitants of the municipality only, but in trust for the use of the public at large equally with the residents of the municipality, and the state may commit to any agency which it may create for that purpose the entire supervision and control of every part of the highways of the state, or it may divide the supervision and control of the highways as it sees fit. By the creation of the Illinois Commerce Commission, with the comprehensive powers over public utilities which have been mentioned, the legislature withdrew from municipalities in the state the power which they had previously exercised in regard to the use of the streets by such utilities and conferred those powers on the Commerce Commission." (p. 212.)

In 1928 the people of Kansas, realizing the need of a state highway system, passed a constitutional amendment which laid the foundation for such a system. Pursuant to the constitutional mandate the legislature formulated a general plan or scheme for the construction and routing of state highways, and for the control and regulation of vehicles and commerce moving on the highways. Some of these statutes are quoted in the opinion of the court. The city never had an express grant to pass the ordinance, and even though an implied power be conceded, it was taken away by these enactments.

It is a matter of common knowledge that the development of our highway system was a recognition of the needs of the state, created by modern motor transportation, and by the production and distribution of oil and gas and their by-products. The legislature has recognized that the transportation of liquid fuels by trucks was a business affecting the entire state. Elaborate and comprehensive acts providing all necessary rules and regulations have been passed. Truck carriers have been licensed by the state. They pay into the state a gross ton-mileage tax in addition to other taxes which go to the upkeep of the highways, including the streets of Ottawa. Their vehicles are limited in size. They must comply with safety regulations pertaining to the handling and transportation of liquid fuels. It would seem obvious that the legislature intended these acts to be all-inclusive, and that the flow of commerce on our highways was not to be interfered with by local municipalities unless expressly authorized.

Kansas is an oil and gas state. Vast amounts of capital have been invested in the production of these minerals. At great outlay refineries have been established. Every hour of the day and night cargoes of these products, both crude and refined, are moving in

intrastate and interstate commerce over our highways. Thousands of people are employed in these industries. We are now gravely told that this vast industry may be seriously interrupted if not entirely destroyed. If the ordinance of the city of Ottawa is valid, other cities may, and doubtless will, pass similar ordinances, and this basic industry will suffer irreparable injury.

Confessedly, the power of the city to pass the ordinance must have its source in a legislative grant. It is conceded that there is no express grant. Neither is there a serious attempt to show an implied power to pass the ordinance. From the language of the court: "Considering the present situation it can readily be seen that a general statute could not adequately and efficiently cover the movement of gasoline in trucks through every city of the state" and similar passages, it would seem the real basis of the decision is the doubt of wisdom of the legislative policy in creating the state highway system and stripping the cities of any assumed power they may have exercised. That question, as I view it, is for the legislature.

We have, then, an ordinance which does not bear any real or substantial relationship to the general welfare of the city—an ordinance extraterritorial in effect, which contravenes the general laws and policy of the state and which interrupts the uniformity of state regulations. I think the ordinance was void and that the order of the lower court should be sustained.