(No. 22152.—

THE CITY OF CHICAGO, Appellee, *vs.* THE ALTON RAIL-
ROAD COMPANY, Appellant.

*Opinion filed December 22, 1933—Rehearing denied Feb. 9, 1934.*

DeYoung and Herrick, JJ. dissenting.

Winston, Strawn & Shaw, (Silas H. Strawn, Frank H. Towner, Guy A. Gladson, and Bryce L. Hamilton, of counsel,) for appellant.

WILLIAM H. SEXTON, Corporation Counsel, (MARTIN H. FOSS, of counsel,) for appellee.

Mr. JUSTICE FARTHING delivered the opinion of the court:

This is an appeal from the judgment of the municipal court of Chicago in an action against the appellant, the Alton Railroad Company, (hereinafter for convenience called the railroad,) to recover an aggregate amount of $214 charged against it under the ordinances of the city of Chicago, the appellee, (hereinafter for convenience called the city). These charges were fees for the inspection of three buildings of the railroad in Chicago and for inspections of its passenger and freight elevators. Judgment was rendered in favor of the city for $169. This was for all the fees claimed except those for inspection of nine elevators in one of the railroad's buildings. The city has assigned cross-errors because the court refused to allow $45 as fees for inspecting these elevators. The appeal has been brought to this court under section 118 of the Practice act. The trial judge certified that there is involved in the case the validity of a municipal ordinance and that in his opinion the public interest requires a direct appeal to this court. It is admitted that the inspections charged for were made and that the buildings and the twenty-one elevators are the property of the railroad.

It was stipulated that the city, prior to January 1, 1932, had passed an ordinance commonly known as the building code, setting forth specifications and regulating the construction and maintenance of buildings within the city of Chicago; that article 3 of chapter 27 of this code covers the installation and maintenance of passenger and freight elevators and their inclosing walls; that section 1658 of article 3 provides for the inspection of elevators at least once every six months by authority of the commissioner of buildings, and makes it the duty of the owner, lessee or

occupant of any building wherein an elevator is installed to permit an inspection and test thereof upon demand; that upon such inspection, if such elevator is found to be in good condition and repair, it shall be the duty of the commissioner to issue a certificate containing the date of inspection, the weight which the elevator will safely carry, and other data, which certificate shall be framed and placed in a conspicuous place in each elevator, and where from such inspection it appears that any elevator is not in safe condition and good working order such certificate shall not be issued until it has been put in good working order satisfactory to the commissioner of buildings. It was also stipulated that other sections of the article cover permits for construction, inclosure of elevator shafts, doors, hatch doors on freight elevators, safety devices, safeguards for elevators, etc. It was further stipulated that section 1196 of article 1, chapter 24, of the code fixed five dollars as the fee for inspecting an elevator; and section 1199 of chapter 24 of the code provides for the annual inspection of buildings over two stories in height, except residences and buildings in which automobiles are housed and except tenements three stories or less in height, and makes it the duty of owners, agents, lessees or occupants thereof to permit the making of such annual inspection by the commissioner of buildings, or by a duly authorized inspector, at any time upon demand; that whenever such inspection shows the building to be in compliance with the requirements respecting stairways, means of egress, etc., it shall be the duty of the commissioner of buildings to issue a certificate to that effect, which shall be framed and posted in a conspicuous place near the main entrance of such building, together with a floor plan of such building and other data. It also provides for the furnishing of copies of such information to the commissioner of buildings for alterations or changes when necessary, and for a fee of five dollars to be paid by the owner to the city collector as an

annual inspection fee where the building contains not to exceed 25,000 square feet of floor area, with an additional inspection fee of three dollars for each additional 25,000 square feet. Whenever such inspection shows a revolving door to be in good working order and in compliance with the ordinances of the city of Chicago pertaining to revolving doors and their use as exit doors, the commissioner of buildings shall issue or cause to be issued a certificate to that effect, and for each such inspection and certificate a fee of three dollars shall be charged; revolving doors affording exit from ground floor premises used by one person, firm or corporation shall be exempt from the semi-annual inspection and fee requirements where such exit door has no connection with or affords no exit facilities to any other floor of the building or to any other premises or space occupied or used by any other person, firm or corporation.

It was also stipulated that the railroad did business as a common carrier of persons and property by rail for hire; that its interstate business was done under the Interstate Commerce acts and its intrastate business under an act concerning public utilities, approved June 29, 1921, effective July 1, 1921.

The buildings belonging to the railroad are Nos. 340-358, 341-359 and 322-324 West Harrison street and Nos. 328-336 West Polk street. The south end of the first building is five stories in height. The upper three floors are used by the railroad as its general offices. The remaining two floors of this building are used as a freight house. Railroad tracks extend the entire length of the first floor. The second floor is on the street level. There are two passenger elevators at the south end of the building. These are used almost entirely by employees going to and from their work in the offices. The railroad runs a restaurant on the third floor of the building. It is patronized for the most part by its employees, but occasionally other persons

having business in the building eat there. The same situation exists as to a barber shop on the third floor, except that it is privately operated by a tenant. Forty-four per cent of the floor space of the building is occupied by tenants who ship or receive freight. There are six freight elevators in this building. These are known as G, H and I and Nos. 6, 7 and 8. They are used by tenants to handle freight into and from freight cars placed at platforms on the first floor. No. 6 is also used by the railroad in handling less than car-load lots of freight.

The building at 322-324 West Harrison street is a five-story structure. It is used exclusively for storing railroad records. It contains no elevators.

The building at Nos. 341-359 West Harrison street is two stories in height. Prior to 1929 it was used as a freight house exclusively by the railroad's predecessor, the Chicago and Alton Railroad Company. At the time of the inspection in question approximately two per cent of its floor space was leased to two tenants which were freight-forwarding companies that ship and receive freight. They used two of the eleven elevators in this building most of the time, but the railroad also used these elevators (A and No. 1) in handling less than car-load lots of freight, and used exclusively the remaining nine elevators—B, C, D, E and F and Nos. 2, 3, 4 and 5. The inspection fees for these elevators were those which were denied by the trial court. There was no inspection fee claimed as to this building.

The building at Nos. 328-336 West Polk street is eight stories in height. It contains four elevators. The building is rented to a tenant which receives and ships freight. All four buildings are in the railroad terminal district of the city.

The railroad contends, first, that by the passage of the Public Utilities acts of 1913 and 1921 the legislature by implication repealed the previous grant of power to the

city to inspect, supervise and regulate the buildings and elevators belonging to the railroad. It says that section 49 of the Public Utilities act (Smith's Stat. 1933, chap. 111⅔, p. 2243,) gives the Illinois Commerce Commission power, either after a hearing had on its own motion or on complaint, to order that safe, proper, adequate and sufficient equipment, appliances and facilities be furnished, erected or employed; that section 50 gives the commission power, after such hearing, to order "additions, extensions, repairs, improvements to or changes in the existing plant, equipment, apparatus, facilities or other physical property of any public utility" when necessary to promote the security or convenience of its employees or the public, and to direct the manner in which additions, repairs, improvements or changes shall be made or new structures erected. Further, that section 57 empowers the commission, after a hearing as above provided, to require every public utility to maintain and operate its plant, equipment or other property in such manner as to promote and safeguard the health and safety of its employees, passengers, customers and the public, and to prescribe the installation, use, maintenance and operation of appropriate safety or other devices or appliances, including "interlocking and other protective devices at grade crossings or junctions and block or other systems of signaling, to establish uniform or other standards of equipment, and to require the performance of any other act which the health or safety of its employees, passengers, customers or the public may demand." The remaining section relied upon by the railroad as containing provisions repugnant to an earlier grant of power of supervision and control to the city is section 63. By it the commission, or any member or duly authorized agent thereof, is authorized to inspect "the plant, equipment or other property of any public utility," etc.

In support of the implied repeal of the powers of the city the railroad cites *Village of Atwood* v. *Cincinnati,*

*Indianapolis and Western Railroad Co.* 316 Ill. 425, and
*City of Altamont* v. *Baltimore and Ohio Railroad Co.* 348
id. 339. In those cases the ordinances under considera-
tion required the respective railroads to maintain flagmen
at grade crossings. It was held that sections 57 and 58
of the Public Utilities act authorized the Commerce Com-
mission to regulate railroad grade crossings for the safety
of the public and withdrew that power from cities and
villages which had previously been conferred on them by
section 27 of article 5 of the Cities and Villages act. A
similar holding was made in *Northern Trust Co.* v. *Chi-
cago Railways Co.* 318 Ill. 402, where the ordinance in
question sought to regulate street car head-lights. The reg-
ulatory power was held to have been withdrawn by impli-
cation from the city and to have been placed in the Com-
merce Commission. In *City of Witt* v. *Cleveland, Cin-
cinnati, Chicago and St. Louis Railway Co.* 324 Ill. 494,
power on the part of a city to regulate the speed of rail-
way trains within the city limits was held to have been
similarly withdrawn, repealed by implication and to have
been vested in the Commerce Commission by the Public
Utilities act. In *Chicago North Shore and Milwaukee Rail-
road Co.* v. *City of Chicago,* 331 Ill. 360, the railroad com-
pany had been authorized by the Commerce Commission
to operate its passenger and merchandise dispatch trains
over elevated lines in the streets of the city. It was held
that the Public Utilities act gave the Commerce Commis-
sion general supervision and control over railroads using
the streets of the city to the exclusion of the city. The
railroad also relies on the cases of *Chicago Motor Coach
Co.* v. *City of Chicago,* 337 Ill. 200, and *City of Chicago*
v. *Chicago Great Western Railroad Co.* 348 id. 193. In
the former an ordinance requiring motor bus lines to ob-
tain a grant of authority from the city before operating
their busses on the streets was held invalid because the
legislature had withdrawn from cities the control of the

use of the streets by utilities and vested it in the Commerce Commission. In the latter case it was held that the Public Utilities act withdrew from cities the powers conferred by the Cities and Villages act with reference to regulating railroad scales and placed those powers in the Commerce Commission.

Without exception these cases deal with matters that are an intimate part of and have the closest connection with the public utility service and with transportation itself. Repeals by implication have never been favored, but in the above cases there was a clear repugnance between the provisions of the Cities and Villages act and the Public Utilities act. In the case before us one of the buildings houses the records of the railroad, another is used for its general offices, a third is used as a freight house, and the fourth may some time in the future be used for railroad business. The last three buildings are occupied in whole or in part by tenants. Whether these tenants ship and receive freight is of no importance. Some of the elevators are used exclusively by the railroad and some are shared with and some used exclusively by its tenants. We are asked to extend the repeal of police powers of cities and villages and to hold that all the property belonging to the railroad, because of that ownership alone, is placed by the Public Utilities act under the control and regulation of the Commerce Commission. In effect such a holding would mean that all of the police powers of cities and villages over public utility property has been impliedly repealed.

We have set out the argument of the railroad as to the first paragraph of section 57 of the Public Utilities act, which section deals directly with railroads and contains the above mentioned "or other property." In their brief and argument counsel for the railroad made no reference to the specific apparatus, safety devices and equipment, such as block signals and the like, and entirely overlooked the second paragraph of section 57. Our conclusion is that

the language omitted from the first paragraph, coupled with the second paragraph, shows that the legislature did not intend to confer upon the Commerce Commission exclusive control over all equipment and property owned by public utilities, and that cities and villages may exercise police power over such property as has no distinctive public utility feature or use where this control will not tend to defeat the objects of the Public Utilities act. The purpose of the Public Utilities act was to bring under the control of the public, for the common good, property applied to public use in which the public has an interest; (*Palmyra Telephone Co.* v. *Modesto Telephone Co.* 336 Ill. 158;) also to establish and to protect public utilities· in their respective fields from destructive competition. (*Chicago Railways Co.* v. *Commerce Com.* 336 Ill. 51.) The act contemplates actual supervision of every public utility, so that continuous, adequate, uniform and satisfactory service shall be rendered to the public at reasonable rates and without discrimination. (*Roy* v. *Commerce Com.* 322 Ill. 452; *Illinois Power and Light Corp.* v. *Commerce Com.* 320 id. 427.) To effectually carry out the purpose of the Public Utilities act does not require us to hold that the Commerce Commission shall regulate buildings used or to be used in the future by the railroad or the elevators now in use by it, or to further hold that by implication these regulatory powers were repealed and withdrawn from the city. There is no overlapping of authority. There is nothing repugnant in permitting the city to continue to exercise its police powers for the safety of the public against fire and other hazards in the one case, and from imperfect and faulty construction or maintenance of elevators in the other case. This will not interfere with full supervision by the Commerce Commission of public utility service or tend to defeat the purpose of the act. To uphold the existing order of control will create less confusion than would be caused if the Commerce Commission were given au-

thority over buildings and elevators of public utilities, and cities and villages authority over all otherwise owned. The mere fact that a building is used for one branch of a public utility's business, such as storage of records, does not so impress a public use upon the building as to take its control and regulation from the city and place it under the Commerce Commission. The service of the railroad will not be impaired by subjecting its record or other buildings to an inspection designed, in part at least, to prevent fire hazards. The uses of the property in question are not such uses as are contemplated by the legislature in the provisions for control and regulation contained in the Public Utilities act, either as to the buildings or as to the elevators. The elevators here do not have the same public utility features that the scales had in the case of *City of Chicago* v. *Chicago Great Western Railroad Co. supra.* The public is interested in the correct weight of goods to be shipped, since weight is one of the factors in determining the shipping charges. The language of the Public Utilities act clearly covers apparatus used in measuring and testing the quality and extent of the service to be rendered, and scales would have to be included under that act and therefore excluded from the control and regulation granted by the Cities and Villages act. But the elevators used carry no charge for their use. No rate or tariff showing the charge for their use was filed with the Interstate Commerce Commission as was done with reference to the scales. They are common to every building of any size and height and are a part of the building, ordinarily. They are not indispensable to the service of transportation. The rule is well established that courts have the duty to uphold the constitutionality of statutes and ordinances whenever this can reasonably be done. *Arms* v. *Ayer*, 192 Ill. 601.

Even if the city has power to inspect its buildings and elevators, the railroad contends that the city has no authority to charge an inspection fee in either instance. Its

contention is that the power to inspect is implied, and that the power to charge a fee would have to be implied, in turn, from the first implied power. By article 5 of the Cities and Villages act the legislature delegated to the city express power to prescribe the manner of constructing buildings (sec. 61); to cause the removal of defective buildings (sec. 62); to prevent the dangerous construction and condition of apparatus used in or about any building and to require all buildings that may be in a dangerous state to be put in a safe condition (sec. 63), and to pass and enforce all necessary police ordinances (sec. 66). By section 102 the city is empowered to pass all ordinances and rules and to make all regulations proper or necessary to carry into effect the powers above mentioned. In *City of Chicago* v. *Arbuckle Bros.* 344 Ill. 597, we held that cities must either have express authority or clearly implied authority necessary to carry out such express powers, but that such powers need not depend upon any one given section of article 5 of the Cities and Villages act and may depend upon several powers so expressed. At page 604 we said: "If there is a reasonable connection between any business or occupation and danger to the public a reasonable ground for regulation is presented. * * * Under the police power, things which are injurious to the public may be suppressed or prohibited. Other things which may or may not be injurious to the public, according to the way in which they are managed, conducted or regulated, may be licensed for the purpose of regulation.—*Condon* v. *Village of Forest Park,* 278 Ill. 218." The language "to prevent the dangerous construction and condition of apparatus used in or about any building," contained in section 63 of article 5 of the Cities and Villages act, clearly includes power to regulate elevators, and there can be no greater question as to section 61 applying to and creating power to regulate buildings. An inspection is the only means that would afford knowledge, from time to time,

as to the condition either of buildings or elevators. In *Chicago, Wilmington and Vermilion Coal Co.* v. *People,* 181 Ill. 270, it was held that "inspection fees are not taxes but are imposed under the principle that they are compensation for services rendered in and about making such inspection, which is presumably beneficial to the person upon whom the fees are imposed under and by virtue of the general police powers of the State." (Citing *City of Charleston* v. *Rogers,* 2 McCord, 495, and Cooley on Taxation, 413.) For the reasons that the city has power to regulate buildings and elevators and that inspection is a reasonable means of carrying into effect the regulatory power, and for the further reason that inspection fees imposed by the municipality which has such power are presumed to be paid for the beneficial service rendered to the person whose property is inspected, this contention of the railroad cannot be upheld.

The railroad next contends that the provisions of the ordinance which require elevators to be kept in good condition satisfactory to the commissioner of buildings of the city of Chicago attempt to vest unregulated and uncontrolled discretion in the commissioner, in violation of section 2 of article 2 of the constitution of the State of Illinois and the fourteenth amendment to the constitution of the United States. In answer to this, the language contained in the ordinance sufficiently details what conditions shall be met to put or keep an elevator in good repair and does not allow the exercise of arbitrary power by the commissioner. In *Block* v. *City of Chicago,* 239 Ill. 251, the city's motion picture ordinance was under attack. It was urged that it was invalid because it required a preview by the chief of police and it was left to him to determine whether or not the pictures were obscene and immoral. The court upheld the ordinance and said: "It has never been questioned that power may be delegated to officers to determine facts, such as whether animals are dis-

eased so as to exclude them from importation; whether meat or food is found upon inspection to be unhealthy or diseased; whether an assemblage amounts to a riot to be dispersed. There are numerous facts of that kind which must be left to administrative officers, and the ordinance is not invalid because the chief of police must determine the question of fact whether a picture or series of pictures is immoral or obscene." In *Spiegler* v. *City of Chicago,* 216 Ill. 114, it was sought to enjoin the enforcement of what was known as the drip-pan ordinance. The contention was the same as here, that by the ordinance legislative power had been sought to be delegated to the commissioner of public works, and that, therefore, the ordinance was invalid. At page 129 we said: "The power to legislate is not conferred by said ordinance upon the commissioner of public works, but he is only given power to approve the drip-pans or other devices with which the said 'tank wagons or other wagons or vehicles' are equipped. The power thus conferred upon the commissioner of public works pertains solely to the execution of the ordinance and not to the passage thereof." No arbitrary power was attempted to be given by the ordinance under consideration. All that the building commissioner could do was to approve such elevators as met the requirements set out in the ordinance, or to refuse to approve them if the inspection made every six months showed that they were not in good repair or condition and did not meet the requirements set out in the ordinance.

The last contention is, that the ordinance is incomplete because it does not specifically designate who shall pay the fees for inspecting the elevators. It is provided in paragraph (*h*) of section 1199 that the owner of the building shall pay the annual building inspection fees, the minimum of which is five dollars, where the aggregate floor space of the building does not exceed 25,000 square feet, etc. The building code is one entire piece of legislation,

and at various places throughout this ordinance the owner, agent, lessee or person in possession is mentioned. In section 1196 are set out the amounts to be paid for building permits, for alterations, and, in addition, the section lists fees to be charged for various kinds of permits and inspections, including a five dollar fee for semi-annual inspection of elevators. In *Arms* v. *Ayer, supra,* the act of 1897 relating to fire-escapes was attacked as being invalid on the ground that it was incomplete and did not specify who should perform the duty of constructing fire-escapes. The act made it the duty of every owner, trustee, lessee or occupant in the actual control of any building to file in the office of the inspector of factories a written application for a permit to construct fire-escapes, and if these persons failed to obey the law a liability was created in favor of the person injured thereby. We held that the term "owner" did not mean the owner of the fee but might mean the lessee in actual possession and control of the building. We said: "We are not aware that any court has held such laws invalid because of their failure to definitely designate who should be liable. We think it clear that under this statute the owner is primarily liable for a failure to perform the duty." Under this holding we think there can be no question here that the ordinance requires the owner, or the person in possession and in control of the elevator, to pay the fee and that the owner is primarily liable for the fees charged for such inspections of elevators. In addition, elevators are a component part of the buildings in which they are situate, and this furnishes an additional ground for placing the primary responsibility upon the owner and holding that the ordinance is not incomplete because section 1196 failed to say specifically that the owner shall pay the inspection fees.

For the reasons stated, under the facts here presented, it follows that no repeal of the powers granted to cities

and villages was brought about by the passage of the Public Utilities acts of 1913 and 1921 in so far as powers were granted to cities and villages to control and regulate buildings and elevators. The cross-errors assigned by the city are sustained and the errors assigned by the railroad are overruled.

The judgment of the municipal court of Chicago is reversed and the cause is remanded to that court, with directions to enter judgment against the Alton Railroad Company and in favor of the city of Chicago in the amount of $214 and costs of suit.

*Reversed and remanded, with directions.*

Mr. Justice DeYoung and Mr. Justice Herrick, dissenting.