JOSEPHINE KIRWIN, Indiv. and on behalf of all persons similarly situated, Plaintiff-Appellant, v. THE PEOPLES GAS LIGHT AND COKE COMPANY *et al.*, Defendants (The Illinois Commerce Commission, Intervenor and Defendant-Appellee; The Peoples Gas Light and Coke Company, Defendant-Appellee).

First District (3rd Division)   No. 86—2394

Opinion filed August 3, 1988.

700

RIZZI, J., dissenting.

Edward M. Burke and Sidney Z. Karasik, both of Chicago, for appellant.

Peter B. Freeman and Sharon H. Rice, both of Hopkins & Sutter, James Hinchliff and William H. Lopez, and Raymond F. Simon and Joseph A. Spitalli, both of Simon & Spitalli, all of Chicago, for appellee Peoples Gas Light and Coke Company.

Steven G. Revethis, of Chicago, for appellee Illinois Commerce Commission.

JUSTICE FREEMAN delivered the opinion of the court:

Plaintiff, Josephine Kirwin, appeals the circuit court of Cook County's dismissal of her amended complaint against defendants, Peoples Gas Light and Coke Company (Peoples Gas) and the City of Chicago (the city). The gravamen of her complaint is that the city has not enforced, and that Peoples Gas is out of compliance with, an ordinance mandating the testing of every gas meter in the city every seven years. The circuit court granted the Illinois Commerce Commission (ICC) leave to intervene as a party defendant. The court based its dismissal of the action on *Peoples Gas Light & Coke Co. v. City of Chicago* (1984), 125 Ill. App. 3d 95, 465 N.E.2d 603, which held an ordinance prohibiting Peoples Gas from terminating gas service to residential customers between the months of November and March invalid as beyond its home rule powers. The appellate court concluded that the State legislature and courts had vested exclusive regulatory jurisdiction over public utilities in the ICC.

On appeal, plaintiff contends generally that the State has not preempted the city's police power to regulate gas meters within its boundaries.

The subject ordinance provides that "[n]o meter after having been once tested and sealed as herein provided shall be allowed to remain in service longer than seven years before being again tested and sealed, as herein provided." Chapter 187 of the Municipal Code further provides that such testing is to be done by the city inspector of weights and measures. Chicago Municipal Code §§187–12, 187–8 (1983).

On the other hand, ICC general Order No. 159, entitled "Standards of Service for Gas Utilities" (83 Ill. Adm. Code 500.10 *et seq.* (1984)), promulgated in accordance with the provisions of section 54 of "An Act concerning public utilities" (Ill. Rev. Stat. 1981, ch. 111²/₃, par. 1 *et seq.*) (the Utilities Act), establishes certain State standards for gas service. (83 Ill. Adm. Code 500.10 (1984).) In contrast to the Chicago Municipal Code, the order contemplates that the testing of gas meters shall be done by the public utilities themselves. (See, *e.g.*, 83 Ill. Adm. Code 500.180, 500.200, 500.215 (1984).) It further provides that "[n]o meter shall be allowed to remain in service more than ten years from the time last tested without being retested." (83 Ill. Adm. Code 500.210 (1984).) Finally, the order allows utilities to adopt scientific sample testing of new and in-service meters and sets certain

requirements for such testing. 83 Ill Adm. Code 500.215 (1984).

██ █ The validity of the subject ordinance turns on whether it constitutes the exercise or performance of a power or function pertaining to the city's government and affairs as provided for in article VII, section 6, of the Illinois Constitution of 1970. (See *County of Cook v. John Sexton Contractors Co.* (1979), 75 Ill. 2d 494, 508, 389 N.E.2d 553; *Peoples Gas Light & Coke Co. v. City of Chicago* (1984), 125 Ill. App. 3d 95, 98, 465 N.E.2d 605.) That section of the Illinois Constitution provides, *inter alia:*

"(a) *** Except as limited by this Section, a home rule unit may exercise any power and perform any function pertaining to its government and affairs including, but not limited to, the power to regulate for the protection of the public health, safety, morals and welfare; ***

* * *

(m) Powers and functions of home rule units shall be construed liberally." (Ill. Const. 1970, art. VII, §6.)

The terms of the grant of home rule power are broad and imprecise, leaving to the courts the duty to determine whether a power exercised by a home rule unit is within the grant of section 6(a). *Ampersand, Inc. v. Finley* (1975), 61 Ill. 2d 537, 539-40, 338 N.E.2d 15; *County of Cook v. John Sexton Contractors Co.* (1979), 75 Ill. 2d 494, 508, 389 N.E.2d 553.

██ If the legislature specifically denies or limits any power or function of a home rule unit in accordance with paragraphs (g), (h), (i), (j), or (k) of section 6 of article 7 of the Constitution (Ill. Const. 1970, art. VII, §§6(g), (h), (i), (j), (k)), and section 7 of "An Act to revise the law in relation to the construction of the statutes" (Ill. Rev. Stat. 1981, ch. 1, par. 1106), no difficulty arises in resolving the issue. (*Hutchcraft Van Service, Inc. v. City of Urbana Human Relations Comm'n* (1982), 104 Ill. App. 3d 817, 822, 433 N.E.2d 329.) Where a statute does not contain such specific provisions, however, the courts must determine whether the legislature intended to preempt the area which is the subject of the statute involved. (*Hutchcraft Van Service, Inc.,* 104 Ill. App. 3d at 823.) In the context of State action versus local action, preemption means the end of local legislative control over a given subject where the legislature has adopted a scheme of regulation over the same subject. *Hutchcraft Van Service, Inc.,* 104 Ill. App. 3d 817.

██ With respect to the Utilities Act we must acknowledge that the legislature has not specifically denied or limited home rule powers over the regulation of public utilities since 1970. The legislature's fail-

ure to act notwithstanding, we believe it is beyond peradventure that the regulation of public utilities generally, and of public gas utilities' meters specifically, have been, since 1913, matters of statewide, not local, concern.

Section 1 of the original Utilities Act created a State Public Utilities Commission. (Ill. Rev. Stat. 1913, ch. 111a, par. 1 (Hurd).) Section 8 of the Act provided, *inter alia*:

"The commission shall have general supervision of all public utilities, shall inquire into the management of the business thereof and shall keep itself informed as to the manner and method in which the business is conducted. It shall examine such public utilities and keep informed as to *** the manner in which their plants, equipments and other property *** are managed, conducted and operated, not only with respect to the adequacy, security and accommodation afforded by their service but also with respect to their compliance with the provisions of this act and any other law, with the orders of the commission ***." (Ill. Rev. Stat. 1913, ch. 111a, par. 8 (Hurd).)

Section 9 of the original Utilities Act provided, *inter alia*:

"Every public utility shall obey and comply with each and every requirement of every order, decision, direction, rule or regulation made or prescribed by the commission ***." (Ill. Rev. Stat. 1913, ch. 111a, par. 9 (Hurd).)

Finally, section 54 of the Act provided:

"The commission shall have power *** to ascertain, determine and fix adequate and serviceable standards for the measurement of quantity, *** or other condition pertaining to the performing of its service or to the furnishing of its product or commodity by any public utility, and to prescribe reasonable regulations for examining, measuring, and testing such service, product or commodity, and to establish reasonable rules, regulations, specifications and standards *to secure the accuracy of all meters and appliances for examining, measuring, or testing such service, product or commodity.* ***

The commission shall provide for the inspection of the manner in which every public utility conforms to the reasonable regulations prescribed by the commission for examining, measuring and testing its service, product or commodity, and the commission may supplement such inspections by examining, measuring, and testing the service, product or commodity of any public utility." (Emphasis added.) Ill. Rev. Stat. 1913, ch. 111a, par. 54 (Hurd).

Thus, plaintiff is clearly in error when she asserts that nothing in the original act "in any way appears to relate to the testing of gas meters." Rather, the original Utilities Act created a comprehensive scheme for the regulation of public utilities generally, and the testing of gas utilities' meters specifically, by the State.

Moreover, sections 8, 9 and 54 were not changed in the 1921 version of the Public Utilities Act (Ill. Rev. Stat. 1921, ch. 111⅔, pars. 8, 9, 54), which also replaced the State Public Utilities Commission with the Illinois Commerce Commission and repealed the 1913 Act (Ill. Rev. Stat. 1921, ch. 111a⅔, pars. 1, 91). Finally, these sections of the earlier Utilities Act continue, as quoted, in the present Utilities Act. See Ill. Rev. Stat. 1985, ch. 111⅔, pars. 4—101, 5—101, 8—301.

This review of the Utilities Act reveals that the regulation of public utilities generally and of gas utilities' meters specifically have been, since 1913, areas of statewide, not local, concern and that the Utilities Act has preempted the city's authority on those subjects. Because the regulation of gas meters has not been an area pertaining to the government and affairs of the city since 1913, the city did not have home rule powers with respect thereto which were in the contemplation of section 6(a) of article 7 of the 1970 Illinois Constitution.

■ We must acknowledge the rule that it is manifestly impossible to find a legislative intent to limit a city's home rule powers in statutes predating the 1970 Constitution because the concept of home rule was totally foreign to pre-1970 legislative contemplation. (*Kanellos v. County of Cook* (1972), 53 Ill. 2d 161, 166-67, 290 N.E.2d 240; *City of Rockford v. Gill* (1979), 75 Ill. 2d 334, 341, 388 N.E.2d 384.) However, the issue here is not whether the legislature, in enacting and reenacting the Utilities Act since 1913, thereby "limited" Illinois municipalities' home rule powers over public utilities. Rather, we believe it is whether the legislature thereby "preempted" whatever authority over public utilities Illinois municipalities may have possessed prior to 1913.

■ Prior to 1970, including the period before 1913, all Illinois municipalities possessed only those powers which they were expressly granted by the legislature or which were necessarily implied in or incidental to powers expressly granted. (*Ives v. City of Chicago* (1964), 30 Ill. 2d 582, 584, 198 N.E.2d 518, 1 J. Dillon, Municipal Corporations 448-50 (5th ed. 1911) (This principle was commonly referred to as Dillon's Rule).) The legislature could modify, restrict, or entirely withdraw these powers at will. (*City of Geneseo v. Illinois*

*Northern Utilities Co.* (1936), 363 Ill. 89, 93, 1 N.E.2d 392.) One method by which the State could withdraw these powers was to establish "new administrative bodies and confer upon them some, or all, of the powers and rights which were formerly prerogatives of [a] *** municipality." *City of Geneseo,* 363 Ill. at 93.

Viewing the issue as the "preemption" of powers expressly granted the city by the legislature before 1913 sufficiently answers plaintiff's reliance on the city's asserted power, prior to 1913, to regulate gas meters. She notes that the city's amended charter of 1863 conferred upon it the power to seal and inspect weights and measures used for sales by measure or weight and that the city has purported by ordinance to require the testing of all new or in-service gas meters since 1907. Even assuming that the former versions of the subject ordinance were validly enacted pursuant to the city's charter, the enactment of the Public Utilities Act in 1913 divested the city of all power to regulate gas meters, as will be made clear below.

According to Professor David C. Baum, who served as counsel to the committee on local government of the Sixth Illinois Constitutional Convention, the framers of the 1970 Illinois Constitution "specifically frowned upon" a judicial preemption doctrine based on preexisting legislative regulation to limit home rule powers. (Baum, *A Tentative Survey of Illinois Home Rule: Powers & Limitations* (pt. 1), 1972 U. Ill. L.F. 137, 156.) Notwithstanding that fact and that "preexisting statutes should not operate to restrain home rule units in the exercise of their powers" (Baum, *A Tentative Survey of Illinois Home Rule: Powers & Limitations* (pt. 2), 1972 U. Ill. L.F. 559, 579), however, Professor Baum also stated:

> "We should acknowledge, perhaps, one set of exceptions to this conclusion. As noted earlier, extensive state *** regulation of a field of governmental activity may stamp that field as statewide *** in nature. This characterization would remove that field from those subjects that 'pertain' to the government and affairs of home rule units and thus also remove it from the powers granted to home rule units by section 6(a). This argument is peculiarly suited to solving problems raised by the transition to home rule. The General Assembly may well neglect to reenact some important preexisting legislation. I have already suggested the examples of statutes placing utility regulation and some aspects of pollution control in the hands of state administrative agencies. This omission should not necessarily permit home rule units to invade these two vi-

tal areas of state concern. A court could rule that those aspects of utility regulation and pollution control that are delegated by statute to the state agencies simply are of statewide rather than local concern and fall outside of the legislative competence of home rule units." (Baum, *A Tentative Survey of Illinois Home Rule: Powers & Limitations* (pt. 2), 1972 U. Ill. L.F. 559, 579.)

Supportive of Professor Baum's conclusions is an observation of the local government committee in its report containing its proposed local government article. In discussing sections 3.2(a) and (b) thereof, now sections (6)(g) and (h) of article VII, the committee observed, aptly to the issue before us, that "extensive conflict could result if each home rule unit *** could regulate public utilities independently and the state was powerless to vest exclusive jurisdiction in a utilities commission." 7 Record of Proceedings, Sixth Illinois Constitutional Convention 1642.

■ In view of the State's strong and pervasive interest in uniform public utility regulation (*Peoples Gas Light & Coke Co. v. City of Chicago* (1984), 125 Ill. App. 3d 95, 98, 465 N.E.2d 603) manifested by the Utilities Act, we believe the city's attempt to regulate the testing of Peoples Gas' meters would do immediate and serious harm to an important State interest. As such, we must conclude that the Utilities Act has preempted this area. See Baum, *A Tentative Survey of Illinois Home Rule: Powers and Limitations* (pt. 2), 1972 U. Ill. L.F. at 579.

Plaintiff cites *City of Geneseo v. Illinois Northern Utilities Co.* (1941), 378 Ill. 506, 39 N.E.2d 26, *cert. denied* (1942), 316 U.S. 670, 86 L. Ed. 1746, 62 S. Ct. 1046 (*City of Geneseo II*), as recognizing that municipalities may exercise police powers not involving distinctive public utility features or uses as long as such exercise does not defeat the objectives of the Utilities Act. *City of Geneseo* involved an attempt to remove the defendants' equipment from the plaintiff cities' streets after expiration of the defendants' franchises to operate within the cities. The ICC had dismissed the complaints based on a prior decision of the supreme court in the same case holding that the Utilities Act had divested municipalities of the power to regulate public utilities. (*City of Geneseo v. Illinois Northern Utilities Co.* (1936), 363 Ill. 89, 1 N.E.2d 392.) After concluding that its prior decision was not *res judicata* as to the appeal before it, the court noted that the Utilities Act had not expressly given the ICC power to control the streets of municipalities. As such, the court reversed the ICC's dismissals of the plaintiff cities' complaints.

*City of Geneseo,* in fact, supports the conclusion that the enactment of the 1913 Utilities Act preempted whatever powers municipalities previously had to regulate public utilities so that no home rule powers to do so were in the contemplation of section 6(a) of the Illinois Constitution upon its adoption in 1970. While admittedly decided when Dillon's Rule, not the broad grant of home rule powers of section 6(a) erected in 1970, was the law, the supreme court's observations are, we believe, no less apposite today:

*"[W]herever the Public Utilities act has granted a specific right or power which may conflict with a like right or power enumerated among those of cities and villages the former will prevail as a repeal, by implication, of such rights vested in the municipality. \*\*\**

Examination of the decisions of this court prior to the decision in the first *Geneseo case* discloses \*\*\* that the superior jurisdiction of the Commerce Commission was based upon an express authorization contained in the Public Utilities act, which was in opposition to a previous right existing in the municipality. \*\*\*

\*\*\* *The power granted the Commerce Commission by sections* 49, 52, 53, *54,* 57, and 58 *is direct, special and necessarily exclusive.* The grant of power in these sections is: 'The Commission shall determine and prescribe;' 'The commission shall have power;' 'the commission shall have authority to prescribe,' and words of similar import, vesting specific authority to do the several things enumerated therein.

In each of the above cases the court held there was a specific grant of authority to the Commerce Commission giving it jurisdiction over something which before that time had been within the jurisdiction of a city or village. There was no doubt about a conflict of authority. The provisions of the statutes were in direct opposition to each other, and under the well-settled principles of statutory construction the powers granted the Commerce Commission became the dominant ones without a specific repeal of the conflicting statutory powers granted cities and villages. There was no question in those cases of inferring a grant of power in the commission, and no question but that there was a direct conflict in which one or the other was superior. The legal proposition to be adduced from these decisions, and which has become *stare decisis,* is that *wherever there is a specific power or authority granted to the Commerce Commission, which is in opposition to a like or*

*similar power granted the city or village the former will prevail, and the latter, without express repeal, will become ineffective."* (Emphasis added.) *City of Geneseo,* 378 Ill. at 514-17.

■ Section 54 of the Utilities Act specifically grants to the ICC authority to regulate gas meters. In so doing, it implicitly divests municipalities of that authority inasmuch as the power granted under that section is "direct, special and necessarily exclusive." (*City of Geneseo,* 378 Ill. at 516.) Having been divested of that authority, we do not believe municipalities were revested therewith upon the adoption of the Constitution of 1970. Moreover, it is irrelevant that, as plaintiff notes, the city retains authority to regulate all other weights and measures under its charter and section 11–53–2 of the Illinois Municipal Code (Ill. Rev. Stat. 1981, ch. 24, par. 11–53–2). It is also irrelevant that the Weights and Measures Act (Ill. Rev. Stat. 1981, ch. 147, par. 101 *et seq.*), enacted in 1874 and reenacted in 1963, does not preempt or otherwise limit the city's authority to regulate gas meters, the legislature having done so with the enactment of the Utilities Act in 1913. As such, we find inapposite *City of Chicago v. Bartels* (1909), 146 Ill. App. 180, and *City of Chicago v. Waters* (1936), 363 Ill. 125, 1 N.E.2d 396, *aff'd sub nom. Hauge v. City of Chicago* (1937), 299 U.S. 387, 81 L. Ed. 297, 57 S. Ct. 241, which upheld weights and measures ordinances of the city as not inconsistent with, nor repealed, superseded or modified by, the original Weights and Measures Act.

None of the "other considerations" plaintiff cites to distinguish *Peoples Gas* warrant a conclusion that the power to regulate gas meters is not exclusively reposed in the State by the Utilities Act.

■ Plaintiff notes that the city purported to regulate gas meters long before the ICC first promulgated General Order No. 159 in 1948 and that the city requires testing every seven years while the ICC requires testing only every 10 years and allows testing by scientific sample. We believe that, the city having been divested of the power at issue since 1913, it was not revested with it by the ICC's nonexercise of its authority on the subject. Moreover, the wisdom of the ICC's rules, in allowing testing by scientific sampling, is not for this court to decide.

■ Plaintiff also argues that the subject ordinance does not interfere with the ability of Peoples Gas to collect payment for its service and thus with the ICC's rate-making authority, unlike the ordinance at issue in *Peoples Gas.* However, utility rate regulation by municipalities is not the only type of municipal regulation prohibited by the Utilities Act. Rather, "[t]he regulation of all aspects of utility

business and service has long been held to be the exclusive province of the [ICC] [citations] and the exclusivity of the [ICC's] jurisdiction has been repeatedly upheld [even] against the assertions of municipal authority over matters of health and welfare [citations]." *Peoples Gas Light & Coke Co.,* 125 Ill. App. 3d at 101.

■■■ Plaintiff notes the court's concern in *Peoples Gas* that "[p]ermitting every home rule unit *** to regulate in this field would subject utilities to multiple and sometimes conflicting governmental requirements which could only result in confusion and would seriously disrupt the [present] regulatory scheme." *(Peoples Gas,* 125 Ill. App. 3d at 101.) She argues that concern is inapplicable here because Peoples Gas serves only the City of Chicago and thus cannot be subjected to multiple or conflicting requirements.

That Peoples Gas serves only the City of Chicago did not validate the subject ordinance in that case and does not validate the subject ordinance here. We read the quoted language from *Peoples Gas* as referring to the varying requirements to which all public utilities would be subjected by different municipalities empowered to regulate them, not the varying requirements to which one utility could be subjected by different municipalities. This is the more reasonable interpretation of this language, given that the Illinois legislature and courts "long ago recognized the overriding need for uniform, comprehensive utility regulation by vesting exclusive regulatory jurisdiction over this area in a single regulatory agency." *(Peoples Gas,* 125 Ill. App. 3d at 101.) It is this need for comprehensive regulation of all utilities by the State which guides our decision, not the fact that Peoples Gas serves only the City of Chicago.

■■■ Plaintiff also asserts that the *Peoples Gas* court was apparently not advised that article 6 of the Utilities Act, comprised of sections 81 through 85, did provide for the exercise by municipalities of concurrent jurisdiction over local utilities. Parenthetically, she argues that the repeal of this article by Public Act 82—583, effective September 24, 1981 (1981 Ill. Laws 2942), was ineffective as a limitation of home rule powers for several reasons. Because we conclude that article 6 is unavailing to plaintiff, we need not address her arguments that its repeal was ineffective.

Article 6 of the 1921 version of the current Utilities Act provided for the concurrent exercise by municipalities of jurisdiction over public utilities. For a municipality to exercise such jurisdiction, however, section 85 required approval by referendum of the adoption of article 6 by a majority of the municipality's voters. (Ill. Rev. Stat. 1921, ch. 111²/₃, par. 89.) This requirement remained unchanged in

the last version of section 85 preceding the repeal of article 6. (Ill. Rev. Stat., 1980 Supp., ch. 111²/₃, par. 89.) Plaintiff did not allege below and does not allege here that the voters of Chicago ever approved the adoption of article 6 of the Utilities Act and, thus, that it is the source of the city's authority to regulate gas meters. As such, that article is unavailing to plaintiff.

■■■ Plaintiff further cites *Jones v. City of Chicago* (1952), 348 Ill. App. 310, 108 N.E.2d 802, to contend that there is no conflict between the subject ordinance and the Utilities Act and that the ordinance controls. In *Jones*, the plaintiffs, operators of public passenger vehicles for hire, challenged a city ordinance requiring them to carry a minimum of $50,000 and a maximum of $100,000 in liability insurance. They contended that the ordinance contravened the Motor Vehicle Act (Ill. Rev. Stat. 1951, ch. 95½, par. 1 *et seq.*), which required only $15,000 insurance for passenger carriers. After finding no conflict between the city ordinance and the Motor Vehicle Act and stating that the only difference between them was the amount of insurance required, the court stated: "An ordinance, because of local conditions, may impose more rigorous or definite regulations under a proper delegation of power in addition to those imposed by the State. *Dean Milk Co. v. City of Chicago*, 385 Ill. 565; and *City of Chicago v. Union Ice Cream Co.*, 252 Ill. 311." (*Jones*, 348 Ill. App. at 316.) We find *Jones* inapposite. It does not appear in *Jones* that the plaintiffs raised any question as to the city's authority to regulate public passenger vehicles with respect to liability insurance after the Motor Vehicle Act purported to do so. That is, it does not appear that they challenged the exercise of home rule powers by the city after the State legislated in the same area. We recognize, however, that the question was raised in the *Dean Milk* and *Union Ice Cream* cases.

*Dean Milk* involved a challenge to a city ordinance requiring the use of "standard milk bottles" for the sale of milk in quantities less than one gallon. The plaintiffs contended that the Milk Pasteurization Plant Act of 1939 (Ill. Rev. Stat. 1939, ch. 56½, pars. 115 through 119) had repealed, by implication, the city's authority under the Cities and Villages Act (Ill. Rev. Stat. 1939, ch. 24, par. 1 *et seq.*) to regulate the sale of milk. The former act provided that "[s]ingle service containers[ ] *** shall be manufactured and transported in a sanitary manner." (*Dean Milk Co. v. City of Chicago* (1944), 385 Ill. 565, 575.) The plaintiffs, sellers of milk in single-service paper cartons, relied on this provision to argue that the Act thus permitted the use of such containers and divested the city of

power to prohibit their use. The court concluded that the Act allowed the use of paper cartons in the State and set certain standards to which they had to conform but did not require municipalities to permit them within their boundaries. The court specifically relied on the Act's saving clause, providing that nothing in the Act impaired or abridged the power of any city to regulate, *inter alia,* the sale of milk, to uphold the ordinance. 385 Ill. at 575-76.

In *Union Ice Cream Co.,* the plaintiffs contended that the Pure Food Act repealed, by implication, the city's authority under the Cities and Villages Act to regulate the sale of impure food by ordinance. After noting that the latter act had been reenacted after passage of the former, the court concluded that the Pure Food Act was not intended to deprive municipalities of their authority under the Cities and Villages Act to regulate the sale of food by ordinances not conflicting with the Pure Food Act. *City of Chicago v. Union Ice Cream Manufacturing Co.* (1911), 252 Ill. 311, 313-14.

These cases do not require a conclusion contrary to that which we have reached in this case. In view of "the longstanding statewide interest in the field of public utility regulation *** manifested by the existence of the [ICC] and by the comprehensive and exclusive regulatory authority [it] has exercised for nearly 70 years" (*Peoples Gas Light & Coke Co.* (1984), 125 Ill. App. 3d at 100), we believe that *City of Geneseo* contains the principles applicable in determining whether the Utilities Act preempts any powers the city may have had prior to 1913 to regulate gas meters. "It is obvious that by *** enactment [of the Utilities Act] it was the legislative intent to withdraw from local municipalities supervision of public utilities and to vest the same in the commission with the exclusive power of regulation and control of all means and instrumentalities used by the utility in the conduct of its business." (*City of Geneseo v. Illinois Northern Utilities Co.* (1936), 363 Ill. 89, 95, 1 N.E.2d 396.) As such, we find cases such as *Jones, Dean Milk,* and *Union Ice Cream,* wherein the legislature passed laws on a subject without manifesting an intent to divest municipalities of their powers over the same subject, distinguishable.

▪▪ Plaintiff lastly contends that Peoples Gas is contractually obligated to abide by the subject ordinance by its acceptance of the franchises of the various gas companies previously operating in the city which it absorbed. She further contends that Peoples Gas has subjected itself to the ordinance by its practice, custom, and usage of abiding by a second ordinance stating that the city "may" inspect and test every gas meter to be installed in the city. Chicago Munici-

pal Code §187—14 (1983).

As already noted, under *City of Geneseo* II an express grant of specific authority to the ICC repeals, by implication, any grant of similar authority to a municipality. Moreover:

> "It is irrelevant that a municipal franchise ordinance has been accepted and acted upon by the grantee utility, for such an ordinance cannot 'stand in the way of the lawful exercise, by the [ICC], of the regulatory police powers conferred upon it by the General Assembly.' [Citation.] Nor can a preexisting contract be considered a limitation on the exercise of the State's police power." (*City of Peoria v. Peoria Water Co.* (1977), 49 Ill. App. 3d 1066, 1068-69, 364 N.E.2d 1003.)

Finally, that defendant has voluntarily complied with other ordinances of the city cannot act as an estoppel against, or waiver of, its right to challenge the subject ordinance. *Peoria Water Co.,* 49 Ill. App. 3d at 1069.

For all of the foregoing reasons, the order of the circuit court of Cook County dismissing plaintiff's complaint is affirmed in its entirety.

Affirmed.

WHITE, P.J., concurs.

JUSTICE RIZZI, dissenting:

The motion of defendant, Peoples Gas Light and Coke Company (Peoples Gas), to dismiss was first heard by Judge James C. Murray. He denied the motion. Later, Peoples Gas filed a motion to reconsider the motion to dismiss, which was heard by Judge Thomas J. O'Brien. Judge O'Brien reconsidered the motion and dismissed the complaint. In my opinion Judge Murray's ruling was correct. I believe that the City of Chicago Gas Ordinance (Chicago Municipal Code §§187—1 to 187—19 (1933)) falls squarely within the purview of the home rule provisions of article VII, section 6(a), of the Illinois Constitution. The Gas Ordinance (Ordinance), including sections 187—7 to 187—18 under the subtitle of "Inspection of Meters," is a legitimate exercise of power pertaining to the City of Chicago's "government and affairs" as provided for in article VII, section 6(a), of the Constitution. It is not a local regulation of a public utility in the sense contemplated by the Public Utilities Act (Act) (Ill. Rev. Stat. 1987, ch. 111²/₃, par. 8—301). The Ordinance is therefore not preempted by the Act or the gas meter regulations promulgated by

the Illinois Commerce Commission (Commission). Accordingly, I would reverse the order granting the motion of Peoples Gas to reconsider and to dismiss, and I would reinstate the prior order of Judge Murray denying the motion to dismiss.

The present Ordinance has long antecedents in Chicago's history. The 1863 charter of the City of Chicago, amending the original charter of 1837, conferred upon the common council (as the present city council was then called) broad powers respecting the inspection and enforcement of weights and measures with respect to "merchandise or property of any description." Accordingly, inspection of gas meters has been the subject of various enactments of the City of Chicago (City) from the turn of the century in which the frequency of inspections has been changed from every four years to the present seven years. The responsibility for such inspections has devolved upon or been assigned to different bureaus and departments of the City. Currently it is vested in the department of consumer services, renamed from the department of consumer sales, weights & measures. Because of the special importance attached to the accuracy and safety of gas meters, the City has long maintained a staff of trained gas meter inspectors.

In denying the motion to dismiss, Judge Murray correctly observed that a municipal requirement that gas meters be inspected, tested, calibrated, certified, sealed and periodically retested and recertified is both a weights and measures provision and a health and safety regulation for the benefit of the City's inhabitants. It has nothing to do with the regulation of rates of public utilities.

The majority concludes that the validity of the gas meter inspection ordinance is not saved by the home rule powers of the City because the State has recognized a "statewide concern" over the subject by enacting section 54 of the Act and therefore the City Ordinance is "preempted." It is true that section 54 of the Act conferred authority upon the Commission to set standards for quantity measurement of a utility's product or service, and to promulgate reasonable regulations to "secure the accuracy of all meters and appliances for examining, measuring or testing" a utility's service, product or commodity. (Ill. Rev. Stat. 1983, ch. 111⅔, par. 54 (now Ill. Rev. Stat. 1987, ch. 111⅔, par. 8—301).) It is notable, however, that although the original Act was adopted in 1913, repealed and reenacted in 1921, no rules or regulations were published by the Commission on that subject until the issuance of its General Order 159, effective July 1, 1965. For the first time, the Commission specifically addressed the subject of gas meter inspections by providing for the

10-year frequency of testing by "statistical sampling techniques."

The conclusion of the majority that regulation of gas meters was withdrawn from municipalities as early as 1913 and exclusively vested in the regulatory agency first known as the Public Utilities Commission (Ill. Rev. Stat. 1913, ch. 111a, par. 1) and later the present Commission is not tenable. Because of the long period of time in which there was a nonexercise of authority on the subject by the Commission and its predecessor, a regulatory vacuum would have existed if the majority's conclusion were true. Plainly, it could hardly have been the intention of the General Assembly or the Commission that gas meters were to be a "do as you please" subject for companies supplying gas to the inhabitants of the State. The remarkably long nonexercise of authority by the Commission and its predecessor demonstrates that the legislature never intended to vest exclusive, *i.e.*, preemptive, authority over periodic and regular official inspection and calibration of gas meters. Obviously, the Commission was satisfied with the exercise by local governments of their authority over the subject within the purview of their police powers.

I acknowledge that regulation of the field of public utilities is vested exclusively in the Commission by the Public Utilities Act. (*Peoples Gas Light & Coke Co. v. City of Chicago* (1984), 125 Ill. App. 3d 95, 465 N.E.2d 603.) However, it does not follow as the majority concludes that the regulation of a measuring device such as a gas meter is a "regulation of the public utility business" in the sense contemplated by the Act or as the term "regulation" is used in the Act. Even before the expressly vested home rule powers of the 1970 Constitution, a number of early Commission decisions recognized that cities and villages could exercise certain police powers which did not involve distinctive public utility features or uses as long as the exercise of such powers did not tend to defeat the objectives of the Act. *City of Chicago v. Alton Ry. Co.* (1933), 355 Ill. 65, 74, 188 N.E.2d 831, 834; *City of Geneseo v. Illinois Northern Utilities Co.* (1941), 378 Ill. 506, 514, 39 N.E.2d 26, 31.

The majority opinion fails to demonstrate that the City's long history of regulating the accuracy and safety of gas meters in any way defeats the objectives of the Act, especially in view of the regulatory vacuum created by the Commission's prolonged nonaction on the subject. Further, as hereafter shown, there is no basic conflict requiring application of the preemption doctrine on concurrent regulation by the City and the Commission on the subject of gas meter inspections.

Moreover, under the weights and measures powers vested in the

City from the time of its charter as a local government, it has undeniable authority to regulate, inspect and test all kinds of scales and measuring devices. This fact must be taken into account here. I therefore agree with Judge Murray's conclusion wherein he stated:

"I feel absolutely convinced that the City has home rule powers to check meters the same way they have home rule powers to check gasoline pumping stations or other types of measuring devices. I can't see why suddenly a public utility's measuring device is somehow beyond the local jurisdiction."

There is no generic difference between the measuring device of a gasoline pump and that used in measuring the accuracy of natural gas. A municipal program to insure the accuracy of measuring devices used in any business enterprise (*e.g.*, a butcher shop, a grocery store or a coal yard) is not a regulation of the business of that enterprise in the sense of governing the price of the commodity so that it would be a distinctive public utility feature. It follows that the City is not treating Peoples Gas, as a public utility, any differently than it does any other business enterprise using a measuring device when its Ordinance requires that there be periodic testing, calibrating and sealing of gas meters. In addition, as a safety regulation, the periodic inspection of gas meters by the City is not qualitatively different than the City's requirement that the use of its streets, alley and roadways be safe notwithstanding their use by Peoples Gas.

Although noting that article VII, section 6(m), of the Illinois Constitution mandates that the "[p]owers and functions of home rule units shall be construed liberally," the majority holds that the Ordinance is not a valid exercise of home rule powers within the grant of article VII, section 6(a), citing *County of Cook v. John Sexton Contractors Co.* (1979), 75 Ill. 2d 494, 389 N.E.2d 553. I believe the majority's interpretation and reliance upon *Sexton* is unfounded. I believe the rationale of *Sexton* supports the position of plaintiff rather than that of Peoples Gas. *Sexton*, along with other recent home rule decisions, illustrates the point that the existence of a "statewide concern" does not of itself preclude the existence of home rule powers where there is also a local concern. Where concurrent jurisdiction may be exercised, if there is no actual conflict between a home rule regulation and a State provision on the subject, preemption does not come into operation.

In addition, home rule units may exercise and perform concurrently with the State any function of a home rule unit to the extent that the General Assembly by law does not specifically limit the concurrent exercise of such function, or specifically declare the State's

exercise of such function to be exclusive. (*Sexton,* 75 Ill. 2d at 507-08, 389 N.E.2d 553, 559-60.) Here, the majority acknowledges that the legislature "has not specifically denied or limited home rule powers over the regulation of public utilities since 1970." (173 Ill. App. 3d at 703.) Indeed, it is undeniable that the legislature has not acted specifically to deprive home rule units of concurrent jurisdiction over gas meter inspections.

Moreover, under the established home rule doctrine, in order for the State to assert exclusive jurisdiction when confronted with a local regulation of the same subject, the area must be "one of overriding statewide interest." (*City of Evanston v. Create, Inc.* (1981), 85 Ill. 2d 101, 115, 421 N.E.2d 196 (upholding the validity of Evanston's landlord/tenant ordinance notwithstanding the existence of a State statute on the same subject).) In upholding the municipality's concurrent power with the State in regulating the minimum age for the sale to and the consumption of alcoholic beverages by persons in the municipality, in *Illinois Liquor Control Comm'n v. City of Joliet* (1975), 26 Ill. App. 3d 27, 30-31, 35, 324 N.E.2d 453, 454-55, the court stated:

"The plaintiff-commission contends initially that liquor control is a subject exclusively for State law and that the broad grant of home-rule power as found in the 1970 Illinois Constitution, article VII, section 6(a), was not intended to cover the regulation of alcoholic beverages. We do not agree with this contention. The Liquor Control Act (Ill. Rev. Stat. 1973, ch. 43, pars. 94 *et seq.*) was passed in 1933 and constitutes the general framework for the regulation of the liquor industry in the State of Illinois. *** It is true that *** the cases *** have held that municipalities may not regulate the liquor industry except as expressly permitted by the State. [Citations.] These expressions in the Illinois Supreme Court are simply a statement of the so-called 'Dillon's Rule,' so labeled because if found expression in 1 Dillon, Municipal Corporations 448 (5th ed. 1911). The so-called rule is a pronouncement to the effect that a local government has only those powers expressly conferred upon it by the State, together with such powers as may be fairly implied or incidental thereto. This rule, however, is not applicable in the case of home-rule municipalities, and such municipalities may freely govern themselves except as restricted by the State, according to the home-rule provisions of the 1970 Illinois Constitution, article VII, section 6 [citations]. ***

Liquor control is unquestionably a matter involved in the protection of public health, safety, morals and welfare [citations]. It is apparent that the control of liquor has been a power and function pertaining to government and the affairs of a municipality—a fact which was recognized by the legislature over the years as it continued to give local governments broad power to determine local liquor regulations." 26 Ill. App. 3d at 30-31.

"Given the language and the spirit of the home-rule provisions in the constitution, and, also, the recent Illinois Supreme Court decisions, we are extremely reluctant to strike down a home-rule ordinance as conflicting with State law, unless the legislature has clearly manifested an intention that such should be the result.

\* \* \*

We must conclude, therefore, on review of the Constitutional Convention Proceedings, the provisions in the constitution, the State statutes, as well as the precedents in the Illinois courts, that the Joliet ordinance [minimum age of 21 for the sale to or the consumption of alcoholic beverages] may stand together with the State law [minimum age of 19 for the sale to or the consumption of alcoholic beverages] \*\*\*." 26 Ill. App. 3d at 35-36.

I submit that within the context of the principles stated in *Illinois Liquor Control Comm'n v. City of Joliet,* there is no difference between a municipality's legitimate home rule power as it pertains to liquor control and a municipality's legitimate home rule power as it pertains to the inspections of gas meters.

Moreover, unlike public utilities which serve multiple municipalities and communities, Peoples Gas is a public utility serving only the City. Since defendant is a public utility serving only the City, there is no need here for statewide uniformity. Absent any need for statewide uniformity in a given area, numerous home rule decisions have concluded that the statutory scheme that was involved was not intended by the legislature to be exclusive. *Sexton,* 75 Ill. 2d 494, 389 N.E.2d 553; *Create, Inc.,* 85 Ill. 2d 101, 421 N.E.2d 196; *Illinois Liquor Control Comm'n v. City of Joliet* (1975), 26 Ill. App. 3d 27, 324 N.E.2d 453; *City of Rockford v. Gill* (1979), 75 Ill. 2d 334, 388 N.E.2d 384; *Town of Cicero v. Fox Valley Trotting Club, Inc.* (1976), 65 Ill. 2d 10, 357 N.E.2d 1118; *Winokur v. Rosewell* (1980), 83 Ill. 2d 92, 414 N.E.2d 724; *Sommer v. Village of Glenview* (1980), 79 Ill.

2d 383, 403 N.E.2d 258.

The majority relies heavily upon *Peoples Gas Light & Coke Co. v. City of Chicago* (1984), 125 Ill. App. 3d 95, 465 N.E.2d 603. In that case, the court affirmed the trial court's ruling that the Chicago Gas Turnoff Ordinance was an impermissible regulation of a public utility in an area preempted by the State and vested in the Commission. However, in that case the court stated;

> "The existence of State regulation in a given area has not always resulted in a finding that the area is not one pertaining to local government and affairs. ***
>
> ***
>
> The above cases have attempted to define the division of power between the State and local government by construing the 'pertaining to' clause of section 6(a). Taken collectively, they stand for the proposition that the limits of home rule should initially be determined by examining the exercise of local governmental power in order to resolve whether or not the matter is one of sufficient local concern as opposed to statewide concern." 125 Ill. App. 3d at 99, 465 N.E.2d at 607.

Thus, *Peoples Gas Light & Coke Co.* is readily distinguishable from the case at hand. A municipal ordinance regulating a gas company in terms of when service may be shut off not only conflicts with the concept of statewide uniformity excluding home rule regulations, but such regulation directly impinges on the utility's ability to collect revenue for its service, which is a subject peculiarly within the jurisdiction of the Commission. Here, however, the City's enforcement of its gas meter inspection ordinance does not conflict with the concept of a statewide uniformity concern, and it does not in any way impinge on Peoples Gas' ability to collect revenue for its service. It is worth noting that Judge Murray found that the gas turnoff ordinance was an impermissible interference with the ratemaking process and therefore invalid, but in denying defendant's motion to dismiss the instant complaint, he found no such impediment to the gas meter testing ordinance.

The majority quotes the following passage from *Peoples Gas Light & Coke Co.*: " 'The regulation of all aspects of utility business and service has long been held to be the exclusive province of the [ICC] [citations] and the exclusivity of the [ICC's] jurisdiction has been repeatedly upheld [even] against the assertions of municipal authority over matters of health and welfare [citations].' " (173 Ill. App. 3d at 709-10, quoting *Peoples Gas Light & Coke Co.*, 125 Ill. App. 3d at 101.) The citations omitted from the quotation, however,

are cases which antedate the home rule provisions of the Illinois Constitution of 1970; *Village of Apple River v. Illinois Commerce Comm'n* (1960), 18 Ill. 2d 518, 523-25, 165 N.E.2d 329, *City of Chicago v. Hastings Express Co.* (1938), 369 Ill. 610, 615, 17 N.E.2d 576, and *Chicago Motor Coach Co. v. City of Chicago* (1929), 337 Ill. 200, 209-10, 169 N.E. 22. Moreover, the local regulation that was involved in each of those cases was struck down because there was an antagonistic conflict with an in-place State regulation. That is not the situation in the present case.

Here, given the long period in which the Commission failed to implement its power to regulate gas meters while the City consistently exercised such jurisdiction, it is inferable that the State deferred to local regulation and was content with concurrent jurisdiction. Moreover, when the Commission did promulgate General Order 159 and its provisions relating to the inspection of gas meters every 10 years, that did not create any antagonism between the Commission's regulation of gas meters and the City's Ordinance. As the court in *City of Chicago v. Bartels* observed with respect to an alleged conflict between a State Act and a city's weights and measures ordinance on the same subject:

> "In our opinion the grounds urged against the validity of the ordinance are not well founded. We find nothing in the Act relative to weights and measures indicating an intention, expressly or impliedly, to change, alter or repeal any provision of the Cities & Villages Act. There is no necessary antagonism between the Acts.
>
> * * *
>
> *** It is well settled, we think, that under its police power any reasonable regulation by the city is proper regarding the public health, welfare, safety or morals of its inhabitants. The public welfare and morals of the citizens are involved in giving true weights and measures in the sale of commodities." *City of Chicago v. Bartels* (1909), 146 Ill. App. 180, 186.

See also *City of Chicago v. Waters* (1936), 363 Ill. 125, 1 N.E.2d 396, *aff'd sub nom. Hauge v. City of Chicago* (1937), 299 U.S. 387, 81 L. Ed. 2d 297, 57 S. Ct. 241; *Jones v. City of Chicago* (1952), 348 Ill. App. 310, 108 N.E.2d 802.

While the majority states that *Bartels* and *Waters* are inapposite, the inescapable fact is that there is no "necessary antagonism" between the Commission's general order relating to gas meter inspections and the City's Ordinance. The latter mandates that no gas meter "after having been tested and sealed" by City inspectors "shall

be allowed to remain in service longer than seven years before being again tested and sealed" by City inspectors. (Chicago Municipal Code §187—12 (1933).) On the other hand, under the Commission's General Order 159 as revised, the utility is required to test meters every 10-year period on a statistical sample basis. No staff of inspectors is involved under the Commission's order. Thus, it is clear that if the City's Ordinance is enforced there is no reason why Peoples Gas could not also simultaneously comply with the Commission's order. The fact that the City's Ordinance requirement may appear more stringent than the Commission's order requirement does not, of itself, present an antagonistic conflict.

Finally, the Ordinance was sustained by Judge Murray not only as a permissible weights and measures ordinance, but also as an ordinance within the ambit of the City's police power for the protection of the public safety. The amended complaint makes these allegations, which we are required to accept as true:

"[T]hat for the seven-year period next before the filing of this lawsuit Peoples Gas has experienced a great increase in leakage of gas from its physical system and thereby has enhanced the potential for fires, explosions, fatal and non-fatal injuries and property damage ***. That the deterioration of defendant's gas meters and its failure to reinspect and retest the same *** constitutes a material or contributing proximate cause of said increase in gas leakage and resulting fires, explosions and other destructive catastrophes costly in life, limb and injurious to the health, welfare and safety of the citizens of the City."

Surely, the City with its undeniable police power to protect the public safety could act to take safety measures in the form of regularly scheduled gas meter inspections to prevent and stop gas leaks in the gas mains and pipes within the City, notwithstanding the jurisdiction of the Commission to regulate Peoples Gas' equipment. It follows that the Ordinance is sustainable as being within the purview of the City's police power for the protection of the public safety. The majority is therefore wrong in not recognizing the validity of the Ordinance as a legitimate exercise of the City's police power for the benefit of the public safety.

Accordingly, I would reverse the order granting the motion of Peoples Gas to reconsider and to dismiss, and I would reinstate the prior order entered by Judge Murray denying the motion to dismiss. I would also remand the case for further proceedings.